# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------- X

In re:                                               Chapter 11

GOODY'S, LLC, et al.,[1]                              Case No. 09-10124 (CSS)

            Debtors.                              Jointly Administered

--------------------------------------------------------------X

## FIRST AMENDED DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE DATED AS OF DECEMBER 23, 2009

Dated:    Wilmington, Delaware       YOUNG CONAWAY STARGATT & TAYLOR, LLP
           December 23, 2009

                        M. Blake Cleary (No. 3614)
                        Margaret Whiteman Greecher (No. 4652)
                        Jaime N. Luton (No. 4936)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        *Counsel for Debtors and Debtors in Possession*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number are: Goody's, LLC (9573); New SYDOOG LLC (2047); New Trebor of TN, LLC (2157); New GOFAMCLO, LLC (2268); New Goody's Giftco, LLC (2366); New Goody's MS, L.P. (2490); New GFCTX, L.P. (2581); New Goody's IN, L.P. (3191); New GFCTN, L.P. (3266); New GFCGA, L.P. (3366); New Goody's ARDC, L.P. (3486); New Goody's Retail MS, L.P. (3527); New Goody's Holding TN, LLC (3620); and New Goody's TNDC, L.P. (3673). The Debtors' address is 504 Rolling Creek Road, Knoxville, TN 37934.

DB02:8333414.13                                          068022.1001

Table of Contents

I.    INTRODUCTION ...................................................................................................1

      A.    General Background ...................................................................................1

      B.    General Terms of the Treatment under the Plan of Holders of Claims and Equity
            Interests ......................................................................................................2

      C.    Recommendation ........................................................................................3

      D.    Voting .........................................................................................................3

      E.    Voting Instructions.....................................................................................5

      F.    Confirmation Hearing ................................................................................6

      G.    Other Important Information.......................................................................7

II.   GENERAL INFORMATION.................................................................................8

      A.    The Debtors' Business and Prepetition Operations ...................................8

      B.    The Debtors' Previous Reorganization Efforts..........................................8

      C.    The Debtors' Significant Secured Prepetition Indebtedness .....................9

            1.    The Senior Secured Credit Agreement. ..........................................9

            2.    The Tranche B Term Loan Agreement. ...........................................9

            3.    The Tranche C Credit Agreement.....................................................9

            4.    The Tranche D Credit Agreement...................................................10

      D.    Events Leading to a Second Chapter 11 Bankruptcy...............................10

      E.    Summary of Significant Postpetition Events and Orders ........................11

            1.    Debtors' Retention of Professionals ..............................................12

            2.    Formation of the Committee and the Retention of Its Professionals.........12

            3.    Cash Collateral................................................................................12

i

4.      Motion to Dismiss and Related Settlement ............................................... 13

5.      The GOB Sales ........................................................................................... 17

6.      Sale, Rejection and Other Disposition of the Debtors' Assets ................. 18

7.      Employee Issues ........................................................................................ 19

8.      Administrative Expenses .......................................................................... 19

9.      The Debtors' Schedules and Bar Dates ................................................... 20

10.    WARN Act Litigation Claims ................................................................... 20

III.     THE DEBTORS' CHAPTER 11 PLAN .............................................................. 21

    A.    Classification and Treatment of Claims and Interests ......................................... 21

          1.      Classification ............................................................................................. 22

    B.    Treatment of Claims and Interests ...................................................................... 24

          1.      Priority Claims (Class 1) .......................................................................... 25

          2.      Secured Claims (Class 2) .......................................................................... 25

          3.      Unsecured Claims (Class 3) ...................................................................... 25

          4.      Equity Interests (Class 4) .......................................................................... 25

          5.      WARN Act (Union) Claims (Class 5A) .................................................... 26

          6.      WARN Act (Class) Claims (Class 5B) ..................................................... 26

    C.    Settlements ............................................................................................................ 26

          1.      WARN Act (Union) Settlement ................................................................ 26

          2.      WARN Act (Class) Settlement .................................................................. 27

    D.    Funding of Distributions and Provisions for Treatment of Disputed Claims ........ 28

          1.      Liquidation of Assets ................................................................................ 28

          2.      Disbursing Agent ...................................................................................... 29

          3.      The Initial Distribution ............................................................................. 29

          4.      Timing of Subsequent and Final Distributions ........................................ 29

| | 5. | Investment of Disputed Claims Reserve | 30 |
| | 6. | Minimum Distribution | 30 |
| | 7. | Undeliverable Distributions | 30 |
| | 8. | Setoff | 30 |
| | 9. | Distributions Paid to Holders of Record | 31 |
| E. | | Implementation and Means of Consummating the Plan | 31 |
| | 1. | Limited Survival and Ultimate Dissolution of Corporate Entities | 31 |
| | 2. | Governance of Estate Assets | 31 |
| | 3. | The Liquidating Agent | 32 |
| | 4. | Substantive Consolidation | 33 |
| | 5. | Closing of the Bankruptcy Cases | 33 |
| F. | | Other Plan Provisions | 34 |
| | 1. | Conditions Precedent to Confirmation | 34 |
| | 2. | The Post-Effective Date Committee | 34 |
| | 3. | Procedures for Resolving Disputed Claims | 34 |
| | 4. | Revesting of Property and Retention of Actions and Defenses | 35 |
| | 5. | Settlement and Compromise of Estate Actions and Avoidance Actions | 36 |
| | 6. | Executory Contracts | 36 |
| G. | | Effects of Plan Confirmation | 37 |
| | 1. | Satisfaction of Claims | 37 |
| | 2. | Injunction | 37 |
| | 3. | No Liability for Solicitation or Participation | 37 |
| | 4. | Limitation of Liability of Exculpated Persons | 38 |
| | 5. | Indemnification by Debtors | 38 |
| | 6. | Releases of Debtor Releasees | 38 |

| | 7. | Term of Injunctions and Stays | 39 |
| | 8. | Release of Liens | 39 |
| | 9. | Cancellation of Instruments | 39 |
| H. | | Bankruptcy Court to Retain Jurisdiction | 39 |
| IV. | | CONFIRMATION AND CONSUMMATION PROCEDURE | 41 |
| | A. | Confirmation Hearing | 41 |
| | B. | Requirements of section 1129(a) of Bankruptcy Code | 41 |
| | 1. | Best Interests Test | 42 |
| | 2. | Feasibility | 42 |
| | 3. | Acceptance by Impaired Classes | 43 |
| | 4. | Confirmation Without Acceptance by All Impaired Classes | 44 |
| V. | | RISK FACTORS | 44 |
| | A. | Allowed Claims May Exceed Estimates | 44 |
| | B. | Plan May Not Be Accepted or Confirmed | 45 |
| VI. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES | 45 |
| | A. | Introduction | 45 |
| | B. | Federal Income Tax Consequences to the Debtors | 46 |
| | 1. | Sale of Assets | 46 |
| | 2. | Cancellation of Indebtedness Income | 46 |
| | 3. | Alternative Minimum Tax | 46 |
| | C. | Federal Income Tax Consequences To Claimholders | 47 |
| | 1. | Recognition of Gain or Loss | 47 |
| | 2. | Accrued Interest | 47 |
| | 3. | Backup Withholding | 48 |

      D.      Federal Income Tax Consequences to Holders of Equity Interests .......................48

      E.      General Disclaimer ..............................................................................................48

VII.    CONCLUSION AND RECOMMENDATION...................................................................49

## DISCLOSURE STATEMENT EXHIBITS

Exhibit A:    Debtors' First Amended Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code Dated as of December 23, 2009

Exhibit B:    Liquidation Analysis

<u>NOTICE</u>

NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE DEBTORS' FIRST AMENDED PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE DATED AS OF DECEMBER 23, 2009 (THE "PLAN") OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CLAIMHOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT (INCLUDING ALL EXHIBITS) AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND OTHER EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THE DEADLINE FOR VOTING TO ACCEPT OR REJECT THE PLAN IS _____ _.M. (PREVAILING EASTERN TIME) ON _____, 2010, UNLESS EXTENDED. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY SUCH DEADLINE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD NOT RELY UPON THIS DISCLOSURE STATEMENT FOR SUCH PURPOSES AND SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT HAS NEITHER BEEN REVIEWED, APPROVED NOR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE U.S. SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS LEADING TO THESE BANKRUPTCY CASES AND FINANCIAL INFORMATION. ALTHOUGH THE DEBTORS BELIEVE THAT THE PLAN AND RELATED DOCUMENT SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY MANAGEMENT OF THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT INACCURACY OR OMISSION.

i

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. THE DESCRIPTIONS SET FORTH HEREIN OF THE ACTIONS, CONCLUSIONS, OR RECOMMENDATIONS OF THE DEBTORS OR ANY OTHER PARTY IN INTEREST HAVE BEEN SUBMITTED TO OR APPROVED BY SUCH PARTY, BUT NO SUCH PARTY MAKES ANY REPRESENTATION REGARDING SUCH DESCRIPTIONS.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING (OTHER THAN THE BANKRUPTCY CASES) INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS OR ANY OF THEIR DIRECT OR INDIRECT SUBSIDIARIES. YOU SHOULD CONSULT YOUR OWN COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE LIQUIDATION ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

# I.    INTRODUCTION

The Debtors (defined below) hereby submit this disclosure statement (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") in connection with the solicitation of acceptances of their First Amended Plan of Liquidation Pursuant to Chapter 11 of the United States Bankruptcy Code dated as of December 23, 2009 (the "Plan"). A copy of the Plan, which was filed with the Bankruptcy Court on December 23, 2009, is annexed hereto as <u>Exhibit A</u> and made a part hereof. Capitalized terms not defined herein shall have the meaning ascribed to them in the Plan. This Disclosure Statement should be read in conjunction with the Plan.

## A.    General Background

On January 13, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors' Bankruptcy Cases are currently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") before the Honorable Christopher S. Sontchi, United Stated Bankruptcy Judge. An official committee of unsecured creditors (the "Committee") in the Bankruptcy Cases was appointed by the United States Trustee for the District of Delaware (the "U.S. Trustee") on January 26, 2009.

On the Petition Date, the Debtors filed an *Emergency Motion of the Debtors for Entry of an Order (I) Approving Assumption of Agency Agreement Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (II) Granting Interim Authorization for the Debtors to Incur Post-Petition Secured Indebtedness in Relation Thereto, (III) Granting Interim Approval of Security Interests and Superpriority Claims Pursuant to Sections 105(a), 361, 364(c) and 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, (IV) Approving Store Closing Sales Free and Clear of Liens, Claims and Encumbrances Pursuant to Sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9014 and (V) Granting Related Relief* [D.I. No. 13] (the "GOB Motion"). On January 14, 2009, the Ad Hoc Committee of Unsecured Creditors (the "Ad Hoc Committee") filed an emergency motion to dismiss the Debtors' chapter 11 cases [D.I. 37]. On January 15, 2009, the Bankruptcy Court approved the store sale guidelines proposed in the GOB Motion and set January 20, 2009 as a hearing to consider the balance of the relief requested in the GOB Motion. On January 21, 2009, after substantive discussions and negotiations with the Ad Hoc Committee and an agreement having been reached in principle resolving the Motion to Dismiss, the Bankruptcy Court approved the assumption of the Agency Agreement and the balance of the relief requested in the GOB Motion. Thereafter, the Debtors sought to monetize the balance of their assets including the sale of their intellectual property rights.

The Debtors used the proceeds of the store closing sales to repay indebtedness owing to their pre-petition secured lenders, General Electric Capital Corporation and GB Merchant Partners, LLC. The Debtors then continued to work with their professionals and with the Committee to liquidate their remaining assets and propose the Plan, which provides, *inter alia*, the means for distributing the cash generated from the liquidation of the Debtors' assets and satisfying claims against, and interests in, the Debtors in accordance with the Bankruptcy Code. To date, the Debtor has generated over $119 million from monetizing and disposing of their assets. From this amount, the Debtors have paid for the cost of administering the Estates and paid approximately $10.25 million to satisfy all requisite payments under the Settlement (as defined below). The Debtors currently have approximately $7.8 million cash on hand.

THE DEBTORS BELIEVE THE PLAN COMPLIES WITH ALL REQUIREMENTS OF THE BANKRUPTCY CODE AND PROVIDES THE BEST AVAILABLE RECOVERY TO THEIR CLAIMHOLDERS AND ESTATES.

**B.  General Terms of the Treatment under the Plan of Holders of Claims and Equity Interests**

The Plan is a single, joint liquidating plan for all Debtors. On and after the Effective Date, the Debtors will continue in existence, but their respective Estate Assets will be managed through a Liquidating Agent who, subject to the terms of the Plan, will be the sole shareholder and director of each of the Debtors and will be responsible for, among other things, (i) winding up the Debtors' affairs as expeditiously as reasonably possible, (ii) liquidating, by converting to Cash or other methods, any remaining Estate Assets, as expeditiously as reasonably possible, (iii) enforcing and prosecuting claims, interests, rights and privileges of the Debtors subject to the terms of the Settlement Agreement (as described and defined below), (iv) resolving Disputed Claims, and (v) administering the Plan.

Set forth below is a summary description of the classification and treatment of all Classes of Claims and Equity Interests provided for in the Plan. Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not included in any Classes of Claims or Equity Interests. The summary of the Plan contained in this section is qualified in its entirety by reference to the more detailed information elsewhere in this Disclosure Statement, in the Plan and in the exhibits to this Disclosure Statement and the Plan. It is the Plan and not this Disclosure Statement that governs the rights and obligations of the parties. The summary does not purport to be complete and should not be relied upon for voting purposes. A more complete description of the Plan is provided in Article III, "THE DEBTORS' CHAPTER 11 PLAN."

**Summary Chart of Classes of Claims and Interests**

| Class | Treatment | Voting Rights |
|---|---|---|
| Class 1 – Allowed Priority Claims | Unimpaired | Deemed to accept the Plan; not entitled to vote |
| Class 2 – Allowed Secured Claims | Unimpaired | Deemed to accept the Plan; not entitled to vote |
| Class 3 – Allowed Unsecured Claims | Impaired | Entitled to vote |
| Class 4 - Equity Interests | Impaired | Deemed to reject the Plan; not entitled to vote |
| Class 5A – WARN Act (Union) Claims | Impaired | Entitled to vote |
| Class 5B – WARN Act (Class) Claims | Impaired | Entitled to Vote |

The Debtors believe that the Plan provides the best possible result in these cases for all Claimholders. The Debtors further believe that under the Plan Claimholders will receive a greater recovery than if the Debtors' chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.

**C.    Recommendation**

The Plan represents the collaborative efforts of the Debtors and the Committee to maximize the immediate cash distribution to holders of Claims. With respect to holders of Unsecured Claims, the Debtors believe that the Plan offers the highest, best, and quickest recovery that could be had in these cases. THE DEBTORS THEREFORE RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

**D.    Voting**

The Plan is being distributed, with ballots, to holders of Claims in Classes 3, 5A, and 5B, which are the Classes of Claims that are impaired under the Plan and will receive a distribution under the Plan. Accordingly, holders of Claims in Classes 3, 5A, and 5B are entitled to vote **either to accept or to reject** the Plan. Holders of Claims in Classes 1 and 2 are deemed to have **accepted** the Plan because their respective Claims are not impaired, and are therefore not entitled to vote on the Plan. Holders of Equity Interests in Class 4 are deemed to have **rejected** the Plan because their Equity Interests are being cancelled, and they will neither receive nor retain any property under the Plan on account of their Equity Interests. Accordingly, the holders of Claims in Classes 1 and 2 and Equity Interests in Class 4 **cannot** vote on the Plan (although they are free to file a written objection to the Plan with the Bankruptcy Court, in accordance with the procedures set forth below). For a more detailed description of the Classes of Claims and

Equity Interests and their treatment under the Plan, see Articles III.A and III.B of this Disclosure Statement.

The Debtors have prepared this Disclosure Statement in connection with their solicitation of votes from holders of Claims in Classes 3, 5A, and 5B. On _____ ___, 2009, the Bankruptcy Court entered an order (the "Disclosure Statement Order"), approving this Disclosure Statement as containing information of a kind and in sufficient detail to enable a hypothetical, reasonable investor, typical of each of the holders of Claims in Classes 3, 5A, and 5B to make an informed judgment whether to accept or reject the Plan. Such approval by the Bankruptcy Court does not constitute a recommendation of the Plan by the Bankruptcy Court.

Section 1129(a) of the Bankruptcy Code allows the Bankruptcy Court to confirm a plan if certain conditions have been met and, with certain exceptions, if each class of claims or interests that is impaired under the plan has voted to accept the plan. As stated above, the Class of the Debtors' Equity Interest holders will be deemed to have rejected the Plan, and therefore the Debtors will seek to confirm the Plan, subject to Bankruptcy Court approval, over that Class's rejection pursuant to section 1129(b) of the Bankruptcy Code, on the grounds that (i) at least one impaired class of Claims is expected to accept the Plan and (ii) the Plan does not discriminate unfairly and is fair and equitable with respect to Class 4 Equity Interests.

Under section 1126(c) of the Bankruptcy Code, a class of claims has accepted a plan if such plan has been accepted by Claimholders in that class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class, excluding holders whose acceptances or rejections were found not to be in good faith. Under the Bankruptcy Code, only parties that actually vote will be counted for purposes of determining acceptance or rejection by any impaired class. Therefore, the Plan could be approved by holders of Claims in Classes 3, 5A, and 5B with the affirmative vote of significantly less than two-thirds in total dollar amount and one-half in total number of the Claims of each Class. However, it should also be noted that even if the holders of all Claims in Classes impaired under the Plan accept or are deemed to have accepted the Plan, the Plan is subject to certain other requirements under section 1129(a) of the Bankruptcy Code and might not be confirmed by the Bankruptcy Court. The Debtors are confident, however, that the Plan satisfies those requirements of section 1129(a), and can be confirmed by the Bankruptcy Court.

Any holder of an impaired Claim (i) whose Claim has been scheduled by the Debtors in the schedules of assets and liabilities filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated), (ii) who has timely filed a proof of Claim, on or prior to June 22, 2009, with respect to which the Debtors or the Committee, as applicable, has not filed an objection on or before the objection deadline, _____, 2010, or (iii) whose claim has been determined or estimated for voting purposes by the Bankruptcy Court, is entitled to accept or reject the Plan (unless such Claim has been disallowed by the Bankruptcy Court for purposes of accepting or rejecting the Plan).

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, NO DISPUTED CLAIM WILL BE COUNTED FOR ANY PURPOSE IN DETERMINING WHETHER THE REQUIREMENTS OF SECTION 1126(C) OF THE BANKRUPTCY CODE HAVE BEEN MET, UNLESS A CLAIMANT WHOSE CLAIM IS DISPUTED HAS FILED A MOTION

FOR TEMPORARY ALLOWANCE FOR VOTING PURPOSES UNDER BANKRUPTCY RULE 3018(A), AND THE BANKRUPTCY COURT GRANTS SUCH MOTION FOR TEMPORARY ALLOWANCE PRIOR TO THE VOTING DEADLINE.

### E.    Voting Instructions

This Disclosure Statement and other documents described herein are being furnished by the Debtors to certain holders of Claims against the Debtors pursuant to the Disclosure Statement Order for the purpose of soliciting votes on the Plan. The Debtors are seeking the acceptance of the Plan by holders of Unsecured Claims (Class 3), holders of WARN Act (Union) Claims (Class 5A), and holders of WARN Act (Class) Claims (Class 5B).

A ballot to be used to accept or to reject the Plan has been enclosed with all copies of this Disclosure Statement mailed to holders of Claims that are impaired by the Plan and entitled to vote. A copy of the Disclosure Statement Order entered by the Bankruptcy Court and a notice of, among other things, voting procedures and the dates set for objections to and the hearing on confirmation of the Plan (the "Notice of the Confirmation Hearing") are also being transmitted with this Disclosure Statement. The Disclosure Statement Order and the Notice of the Confirmation Hearing set forth in detail the deadlines, procedures, and instructions for casting votes to accept or reject the Plan, for filing objections to confirmation of the Plan, the treatment for balloting purposes of certain types of Claims, and the assumptions for tabulating ballots. In addition, detailed voting instructions accompany each ballot for each Class. Each holder of a Claim within a Class entitled to vote should read the Disclosure Statement, the Plan, the Disclosure Statement Order, the Notice of Confirmation Hearing, and the instructions accompanying the ballots in their entirety before voting on the Plan. These documents contain important information concerning how Claims and Equity Interests are classified for voting purposes and how votes will be tabulated.

If you hold Claims in more than one Class and are entitled to vote Claims in more than one Class, you must use separate ballots for each separate Class. Please vote and return your ballot(s) in accordance with the instructions set forth herein and the instructions accompanying your ballot(s). PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. To be counted, your vote indicating acceptance or rejection of the Plan must be properly completed in accordance with the instruction on the ballot.

To be counted, your vote indicating acceptance or rejection of the Plan must actually be received by the Debtors' Voting Agent, Logan & Company, Inc. (the "Voting Agent"), no later than _____ _m., prevailing Eastern Time, on _____, 2010 (the "Voting Deadline"). Ballots received after that time will not be counted, except to the extent the Debtors so determine or as permitted by the Bankruptcy Court pursuant to Bankruptcy Rule 3018.

All ballots must be sent to the Voting Agent at the following address:

<u>VIA U.S. MAIL OR OVERNIGHT DELIVERY</u>

Logan & Company, Inc.
Goody's, LLC Balloting Center
546 Valley Road
Upper Montclair, NJ 07043

Consistent with the provisions of Rule 3018 of the Bankruptcy Rules, the Bankruptcy Court has fixed a Record Date of _____ __, 20___ (the "<u>Record Date</u>"). This is the date for the determination of holders of record of Claims who are entitled to vote on the Plan. All votes to accept or reject the Plan must be cast by using a ballot. Votes which are cast in any manner other than by using a ballot will not be counted.

If your ballot is damaged or lost, or if you do not receive a ballot, you may request a replacement by contacting the Voting Agent at Attn: Goody's LLC Balloting Center.

After carefully reviewing the Plan, including all schedules thereto, and this Disclosure Statement and its exhibits, please indicate your vote on the enclosed ballot, sign it, and then return it in the envelope provided. In voting to accept or to reject the Plan, please use only a ballot sent to you with this Disclosure Statement or by the Voting Agent.

A ballot may be withdrawn by delivering a written notice of withdrawal to the Voting Agent, so that the Voting Agent actually receives such notice prior to the Voting Deadline. Thereafter, withdrawal may be effected only with the approval of the Bankruptcy Court by filing a motion in accordance with Bankruptcy Rule 3018(a).

**F.     Confirmation Hearing**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing (the "<u>Confirmation Hearing</u>") with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met. The Confirmation Hearing has been scheduled to commence at ___:___ _.m. (Prevailing Eastern Time) on _____ __, 2010 before the Honorable Judge Christopher S. Sontchi, United States Bankruptcy Court, District of Delaware, 824 Market Street, 5th Floor, Courtroom #6, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice other than an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served upon the following on or before 4:00 p.m. (Prevailing Eastern Time) on _____ ___, 2010:

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19801
Attn: M. Blake Cleary, Esquire

Goody's LLC
504 Rolling Creek Road
Knoxville, TN 37934
Attn: David G. Peek

Cooley Godward Kronish LLP
1114 Avenue of the Americas
New York, NY 10026
Attn: Cathy Hershcopf, Esquire and Jeffrey L. Cohen, Esquire

Benesh, Friedlander, Coplan & Aronoff LLP
222 Delaware Avenue, Suite 801
Wilmington, DE 19801
Attn: Bradford J. Sandler, Esquire

Office of the United States Trustee
844 King St., Suite 2207
Wilmington, DE 19801
Attn: Joseph M. McMahon, Esquire

### G.  Other Important Information

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN
OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH
SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THIS DISCLOSURE STATEMENT IS PROVIDED FOR USE SOLELY BY
HOLDERS OF CLAIMS IN CLASSES 3, 5A, AND 5B AND THEIR ADVISORS, IN
CONNECTION WITH THEIR DETERMINATION TO ACCEPT OR TO REJECT THE
PLAN, OR TO OBJECT TO THE PLAN.  THIS DISCLOSURE STATEMENT, UPON
WRITTEN REQUEST, WILL ALSO BE PROVIDED TO OTHER CLAIMHOLDERS IN
THIS CASE AND TO HOLDERS OF EQUITY INTERESTS OF THE DEBTORS (TO
THE EXTENT KNOWN BY THE DEBTORS) IN ORDER FOR SUCH PARTIES TO
DETERMINE WHETHER TO OBJECT TO THE PLAN.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE
THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY
LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE.  EACH SUCH HOLDER
SHOULD THEREFORE CONSULT WITH HIS, HER, OR ITS OWN LEGAL,
BUSINESS, FINANCIAL AND/OR TAX ADVISORS AS TO ANY MATTER

CONCERNING THESE CASES, THE PLAN, AND THE TRANSACTIONS
CONTEMPLATED THEREBY.

## II.     GENERAL INFORMATION

### A.     The Debtors' Business and Prepetition Operations

Founded in 1953, the Debtors operated specialty stores that sold clothes, shoes,
accessories and gift items for the whole family. The Debtors' major brand names included
Dockers, Levi's, Lee, Alfred Dunner, NIKE, Reebok and Skechers, as well as its own labels,
such as Duck Head, Ashley Judd, Ivy Crew, and Mountain Lake, which accounted for about one
quarter of the Debtors' total sales.

On the Petition Date, the Debtors operated 282 specialty stores under the
Goody's name in the following states: Alabama, Arkansas, Florida, Georgia, Illinois, Indiana,
Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Ohio, Oklahoma,
South Carolina, Tennessee, Texas, Virginia and West Virginia. The Debtors also maintained a
website, www.goodysonline.com, for, among other things, product information, and customer
service.

The Debtors differentiated themselves from other clothing retailers by focusing on
smaller towns where budget-minded shoppers seek out popular brand names, and by paying
closer attention to their customers' lifestyle (e.g., by stocking a wider variety of more formal
clothing for a customer that dresses more traditionally for church and other weekend activities).
In those markets, the Debtors did not believe that big national chains were able to, or did, draw
significant business away from small-town specialty stores

### B.     The Debtors' Previous Reorganization Efforts

On June 9, 2008, the predecessors of the Debtors (the "Goody's I Debtors") each
filed a Chapter 11 Petition in the United States Bankruptcy Court for the District of Delaware
(the "First Bankruptcy"). A plan of reorganization was confirmed on October 7, 2008, and its
effective date was October 20, 2008 (the "Goody's I Plan").

Prior to the First Bankruptcy, the Goody's I Debtors had experienced operational
losses for the previous 3 fiscal years. Those losses were funded by increased borrowings under
the previous credit facilities as well as by the infusion of additional $65 million in debt capital
provided to the Goody's I Debtors. The Goody's I Debtors continued to experience significant
losses in early 2008, leading to the First Bankruptcy.

The Goody's I Debtors closed approximately 74 underperforming stores during
the First Bankruptcy. In addition, the Goody's I Debtors restructured their debt so as to emerge
from the First Bankruptcy in a stronger financial position and planned to produce an adequate
level of EBITDA in fiscal 2009.

The Goody's I Plan restructured the Debtors' operations by creating new limited
liability companies as the reorganized debtors. Pursuant to the Goody's I Plan, prepetition
secured lenders were satisfied through new financing, with the exception of the secured claim

held by Prentice Capital Management, PGDYS, LLC, and PGDYS Lending, LLC (collectively "Prentice"). Prentice received the membership interests in the new parent company of the Debtors, Goody's Parent LLC. General unsecured creditors received a pro rata distribution of cash and preferred units in Goody's, LLC. Any unpaid and allowed administrative claims became obligations of the reorganized debtors pursuant to the Goody's I Plan.

### C. The Debtors' Significant Secured Prepetition Indebtedness

#### 1. The Senior Secured Credit Agreement.

Prior to the Petition Date, the Debtors were parties to a credit agreement (the "Senior Secured Credit Agreement") that provided for a revolving credit facility with various lenders, General Electric Commercial Capital ("GECC") as agent, in the maximum amount of $175 million of revolving commitments inclusive of a letter of credit sublimit (the "Revolving Credit Facility").[2] The Revolving Credit Facility and letters of credit were secured by first priority liens on and security interests in substantially all of the assets of the Debtors, including a floating lien on the Debtors' inventory. As of the Petition Date, the amount outstanding under the Senior Secured Credit Agreement was approximately $550,000 plus approximately $15 million in letters of credit.

#### 2. The Tranche B Term Loan Agreement.

Prior to the Petition Date, the Debtors also had entered into an amended and restated term loan (the "Tranche B Term Loan Agreement") pursuant to which GB Merchant Partners, LLC provided a term loan in the original principal amount of $10 million. As of the Petition Date, the amount outstanding under the Tranche B Term Loan Agreement was approximately $10 million. The obligations under the Tranche B Term Loan Agreement were secured by second priority liens on and security interests in substantially all of the Debtors' assets.

#### 3. The Tranche C Credit Agreement.

Prior to the Petition Date, the Debtors also had entered into a tranche C credit agreement (the "Tranche C Credit Agreement") pursuant to which PGDYS Lending LLC provided a term loan in the original principal amount of $20 million. As of the Petition Date, the amount outstanding under the Tranche C Credit Agreement was approximately $20 million plus accrued interest and fees. The obligations under the Tranche C Credit Agreement were secured by third priority liens on and security interests in substantially all of the Debtors' assets.

---

[2] The actual availability is based principally upon a borrowing base formula of certain eligible accounts receivable and inventory.

## 4. The Tranche D Credit Agreement.

Prior to the Petition Date, the Debtors also had entered into a tranche D credit agreement (the "Tranche D Credit Agreement") pursuant to which PGDYS Lending LLC provided a term loan in the original principal amount of $15 million. As of the Petition Date, the amount outstanding under the Tranche D Credit Agreement was approximately $15 million plus accrued interest and fees. The obligations under the Tranche D Credit Agreement were secured by fourth priority liens on and security interests in substantially all of the Debtors' assets.

## D. Events Leading to a Second Chapter 11 Bankruptcy

The Goody's I Plan anticipated some modest losses would occur in the months following confirmation. Unfortunately, the significant downturn in the national economy caused severe and unexpected financial pressures. Subsequent to October 20, 2008 (the effective date of the Goody's I Plan in the First Bankruptcy), the Debtors suffered from unexpectedly poor sales during the holiday season, traditionally the strongest season for sales. The following are specific examples of the economic factors causing the Debtors' devastating losses:

(a) Through October, general economic conditions declined, most notably with a steep decline in the financial markets and a freeze in the credit markets. October same store sales declined 19.2% (the Goody's I Plan had anticipated a decline of 2.9%), causing a $4 million shortfall in planned EBITDA before restructuring expense ("EBITDAR").

(b) Advertising vendors required unplanned prepayment of advertising events that were scheduled to run during the holiday season, resulting in $15.0 million negative impact to liquidity.

(c) Trade vendors and factors did not provide sufficient terms and effectively stopped shipping on any terms after the Thanksgiving holiday weekend, which had a negative impact on liquidity.

(d) Actual November same store sales declined 18.4% compared to a planned same stores sales decline of 4.4%, causing a $7.3 million shortfall to planned EBITDAR.

(e) As a result of the overall declining retail environment and the lack of inventory deliveries, actual December same store sales declined 13.6% compared to a planned same stores sales increase of 2.7%. Furthermore, increased markdowns in an effort to stimulate sales impaired overall margin rates for the month, resulting in a $14.3 million shortfall to planned EBITDAR.

As a result of these events and prior to the Petition Date, the Debtors began a dual track process to 1) find a potential buyer/investor and 2) seek an out of court solution to maintain the Company as a going concern. In mid- to late December, the Debtors solicited potential investors/buyers in a targeted process to raise funds or sell the company. The solicited potential buyers/investors included: several private equity firms known to have historically invested in

distressed retail; a former owner of the Debtors, a competitor who had previously expressed interest in the Debtors' business. The targeted, but intense process was unable to generate interest in acquiring the Debtors.

During the same time period, the Debtors worked with counsel to the Unsecured Creditors Committee from the First Bankruptcy, to present a composition plan to the vendor community in the hopes of maintaining the Debtors' business as a going concern. On or around December 23, 2008, the Debtors had a call with over 200 vendors at which time the Debtors outlined the concessions needed to maintain the business as a going concern. As part of the plan, Prentice was willing to consider adding funding of $5.0 million and providing certain other concessions. Additionally, on December 29, 2008, the landlords of the Debtors' leased properties were solicited by DJM and asked to provide rent concessions as part of the overall composition plan.

During this same period, the Debtors also met with several potential liquidators requesting bids to perform a liquidation of all of their assets. As part of that process, the Debtors established a secure ftp website to allow potential liquidators real time access to the current inventory levels. The Debtors solicited bids from all interested liquidators, requesting bids based upon the ways the liquidation could be conducted (in court versus out of court) and the potential compensation arrangements with the bidders (equity versus fee).

By December 29, 2008, it became apparent that there would not be sufficient trade vendor support for the composition plan thereby ending any ability to complete an out of court "going concern" restructuring.

Following the unsuccessful attempt at the composition plan (and based on their ongoing investigation), the Debtors concluded that the best way to maximize the value of the business for the benefit of creditors was to conduct an orderly liquidation with the assistance of a professional liquidator. Professional liquidators indicated that there would be more value created for the estate if sales could begin by January 9, 2009.

In order to expedite the selection of a liquidator and begin the liquidation process by January 9, 2009, the Debtors conducted a competitive bidding process to assure the highest and best bid for the liquidation so as to maximize value of the assets.

On January 5 and 6, 2009, the Debtors held an auction between two bidding groups for the inventory and store assets. The competitive bidding process resulted in the selection of a joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC as the liquidator (collectively, the "Agent"). An agreement was entered into effective January 6, 2009 (the "Agency Agreement").

E.      **Summary of Significant Postpetition Events and Orders**

As in any major chapter 11 case, many motions, applications and orders have been filed and entered on the Bankruptcy Court's official docket for the Bankruptcy Cases. The following information relates to certain significant events and orders in these Bankruptcy Cases:

1. **Debtors' Retention of Professionals**

Pursuant to sections 327 and 328 of the Bankruptcy Code, Bankruptcy Rule 2014 and orders of the Bankruptcy Court, the Debtors retained the following professionals in these cases: (i) Young Conaway Stargatt & Taylor, LLP ("YCST") as bankruptcy counsel, (ii) Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") as special counsel, (iii) FTI Consulting, Inc. ("FTI") as financial advisors, (iv) DJM Asset Management, LLC ("DJM") as special real estate consultant, (v) Streambank LLC ("Streambank") as intellectual property disposition consultants; and (vi) Deloitte Tax LLP ("Deloitte") as tax service providers. Since the Petition Date, these professionals have been paid approximately 80%–100% of their fees and 100% of their expenses on a monthly basis, pursuant to the professional fee procedures approved by the Bankruptcy Court.

Pursuant to 28 U.S.C. §156(c), Bankruptcy Rule 2002(f), Local Rule 2002-1(f), and the order of the Bankruptcy Court, the Debtors retained Logan & Company, Inc. ("Logan") as claims, notice and balloting agent. Pursuant to Bankruptcy Court order, Logan has been paid for its fees and expenses in full, as billed to the Debtors in the ordinary course of business.

2. **Formation of the Committee and the Retention of Its Professionals**

The U.S. Trustee appointed the Committee on or about January 28, 2009, which consisted of the following parties: Quebecor World (USA) Inc.; Triangle S.C. LLC; All Star Apparel; VF Jeanswear Limited Partnership d/b/a Lee Company; Alfred Dunner Inc.; Homedics, Inc.; Chaps/Warnaco.

The Committee retained, pursuant to orders of the Bankruptcy Court, the following professionals: (i) Cooley Godward Kronish LLP ("Cooley") as lead counsel and (ii) Benesh, Friedlander, Coplan & Aronoff LLP as local Delaware counsel and conflicts counsel. Since their retention, these professionals have been paid approximately 80%–100% of their fees and 100% of their expenses on a monthly basis, pursuant to the professional fee procedures approved by the Bankruptcy Court. The Office of the United States Trustee subsequently filed a notice of appeal from the order approving the retention of Cooley as counsel to the Committee (the "Cooley Appeal") [D.I. 454] and designated items for inclusion in the record [D.I. 511]. The Cooley Appeal before the United States District Court for the District of Delaware is still pending.

The Committee has been active in connection with the motions and applications filed in these Bankruptcy Cases and in the formation of the Plan.

3. **Cash Collateral**

On January 15, 2009, the Bankruptcy Court authorized the Debtors, on an interim basis, to (i) temporarily use cash collateral with the Prepetition Lenders, (ii) grant adequate protection, and (iii) modify the automatic stay as related thereto.

On March 4, 2009, the Bankruptcy Court entered the *Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection and (III) Modifying the Automatic Stay* [Docket No. 440] (the "Final Cash Collateral Order"). Pursuant to the Final Cash Collateral

Order, the Committee could challenge the claims of the Prepetition Senior Lenders, which included, *inter alia*, payment of early termination fees paid by the Debtors (i) in the amount of $1.75 million to the Prepetition Revolver Agent (the "Prepetition Revolver Early Termination Fee"), and (ii) in the amount of $500,000 to the Prepetition Term Loan Lenders (the "Prepetition Term Early Termination Fee" and together with the Prepetition Revolve Early Termination Fee, the "Prepetition Senior Lenders Early Termination Fees"). Thereafter, the Committee and the Prepetition Revolver Agent and the Prepetition Term Loan Agent entered into discussions and negotiations that lead to a resolution of Committee's right to challenge the claims of the Prepetition Senior Lenders.

On April 22, 2009, the Bankruptcy Court entered an *Order Pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019 for an Order Approving and Authorizing the Stipulation Resolving Issues with Prepetition Senior Lenders* (the "Stipulation") [D.I. 604]. Pursuant to the Stipulation, the Prepetition Revolver Agent paid $250,000 to the Debtors' estates and the Prepetition Term Loan Lenders paid $50,000 to the Debtors' estates to resolve potential litigation relating to the Prepetition Senior Lenders Early Termination Fees.

### 4.    Motion to Dismiss and Related Settlement

As noted above, the Goody's I Plan restructured the Debtors' operations by creating new limited liability companies as the reorganized debtors. Pursuant to the Goody's I Plan, prepetition secured lenders were satisfied through new financing, with the exception of the secured claim held by Prentice. Prentice received the membership interests in the new parent company of the Debtors, Goody's Parent LLC. General unsecured creditors received a pro rata distribution of cash and preferred units in Goody's, LLC. Any unpaid and allowed administrative claims became obligations of the reorganized debtors pursuant to the Goody's I Plan.

Under the terms of the Goody's I Plan, certain reserves were established for administrative creditors including, but not limited to, reserves for claims arising from goods and/or services provided during the pendency of the Goody's I case and claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code (collectively, the "Administrative Claim Reserves"). The Administrative Claim Reserves were initially funded in the aggregate amount of $2 million. Thereafter, the Goody's I Plan required the reorganized debtors to replenish such reserves in the event they were insufficient to satisfy all allowed administrative claims in full, as required by the Goody's I Plan and the Bankruptcy Code.

The day after the Debtors commenced the instant bankruptcy, on January 14, 2009, an Ad Hoc Committee of Unsecured Creditors of Goody's, LLC (the "Ad Hoc Committee") filed an emergency motion (the "Motion to Dismiss") [D.I. 37] to dismiss the Goody's II chapter 11 cases alleging, among other things, that the Goody's II cases were filed in bad faith in an attempt to avoid satisfying substantial administrative obligations which remained unpaid under the terms of the Goody's I Plan.

The Bankruptcy Court established a trial date of January 20, 2009 to hear the Motion to Dismiss, stressing that the critical issue to be considered at that time would be whether

the Goody's I Plan had been substantially consummated, the resolution of which would guide the Bankruptcy Court in determining whether the Goody's II cases should be dismissed.

With a "substantial consummation" trial scheduled in five days, the Ad Hoc Committee, Prentice Entities, and the Plan Administrator entered into intensive negotiations in an attempt to address the outstanding administrative obligations which remained under the Goody's I Plan. With the focused attention of the parties, a preliminary agreement was reached on Friday, January 16, 2009.

In light of the substantial progress accomplished between the Parties, the Ad Hoc Committee withdrew its Motion to Dismiss without prejudice on January 20, 2009 [D.I. 98] and supported the Bankruptcy Court's approval of the Goody's II Debtors' assumption of the Agency Agreement. However, the Ad Hoc Committee explicitly reserved the right to renew its Motion to Dismiss on an expedited basis in the event the settlement terms were not approved by the Court.

The settlement (the "Settlement") among the parties enabled the Debtors to make substantially greater progress in satisfying obligations that remain outstanding under the Goody's I Plan, which were previously unsatisfied, while addressing a multitude of "inter-estate" disputes between the Goody's I and Goody's II bankruptcy cases. The terms of the Settlement are summarized herein as follows: [3]

    a.    **Increase the Administrative Reserve Under Goody's I Plan:** Prentice agreed to allow the Debtors to use their cash collateral to provide an additional $5 million to the plan administrator appointed pursuant to the Goody's I Plan (the "Goody's I Plan Administrator") to satisfy accrued and unpaid administrative obligations under the Goody's I Plan. In addition, the Debtors and Prentice agreed to transfer certain Litigation Rights and Permitted Preference Actions (as defined in the Goody's I Plan) to the Goody's I Plan Administrator, the proceeds of which also will be available to satisfy accrued and unpaid administrative obligations under the Goody's I Plan (collectively, the "Administrative Reserve Increase"). The cash portion of the Administrative Reserve Increase was paid in full before the Prentice Entities received payment in full on account of their Tranche C obligations.

    b.    **Satisfy Obligation to Allowed Class 8 Claims Under Goody's I Plan:** The Goody's I Plan provided that a $15 million instrument payable to Allowed Class 8 Claims (general unsecured creditors) of the Goody's I case was entitled to receive payment senior in priority to any payment

---

[3] The summary of the Settlement is qualified in its entirety by the Settlement itself. If there are any inconsistencies between the summary contained herein and the Settlement, the Settlement shall control. Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the Settlement.

made to the secured Tranche D obligations to the PGDYS Lending, except in the event of a subsequent liquidation or sale of substantially all of the company's assets under section 363 of the Bankruptcy Code. In this alternative liquidation scenario, the Goody's I Plan requires that $1/3^{rd}$ of proceeds available after satisfaction of the Tranche C obligations be paid to the Goody's I Plan Administrator on account of the Allowed Class 8 Claims under the Goody's I Plan and $2/3^{rds}$ of the proceeds be paid to PGDYS Lending on account of the Tranche D obligations, until such time as the Tranche D obligations have been paid in full. The Settlement follows the dictates of the Goody's I Plan, as required by the order confirming the Goody's I Plan, and provides that after satisfaction in full of the Tranche C obligations, $1/3^{rd}$ of the remaining proceeds available from the liquidation will be paid to the Goody's I Plan Administrator in further satisfaction of Allowed Class 8 Claims and $2/3^{rd}$ of the proceeds will be paid to PGDYS Lending on account of their Tranche D obligations.

c.   **Avoidance Actions in the Goody's II Case Will be Transferred to the Goody's II Committee:** Pursuant to the Settlement, the Debtors agreed to transfer sole and exclusive authority to pursue (or not pursue) any and all causes of action pursuant to chapter 5 of the Bankruptcy Code (the "Avoidance Actions") to the Committee.

d.   **Payment of Goody's II Administrative Claims:** Prentice shall permit the Goody's II estates to use Prentice's cash collateral to pay in full the allowed administrative expense claims in the Goody's II case in accordance with, and subject to a wind-down budget.

e.   **Provision of Funds to Enable Goody's I Plan Administrator and Post Effective Date Committee in Goody's I to Perform Goody's I Plan Obligations:** The Goody's I Plan Administrator will be provided up to $250,000, inclusive of the $100,000 advance provided to the Goody's I Plan Administrator on January 9, 2009, from the cash collateral of Goody's II, along with the right to use $1/3^{rd}$ of the net proceeds from the Litigation Rights and Permitted Preference Actions, in furtherance of performing its fiduciary obligations under the Goody's I Plan. Further, the Post Effective Date Committee (as defined in the Goody's I Plan) will be provided up to $15,000 to perform its oversight functions under the Goody's I Plan.

f.   **Allowance of Prentice Claims in Goody's II Cases:** All obligations under the Tranche C exit facility ($20 million) and Tranche D exit facility ($15 million) were deemed to be allowed secured claims, plus all accrued interest, fees, costs, expenses, and all other Obligations as defined in the credit documents for all purposes in these Cases; provided, however, that all parties' rights were reserved with respect to the determination,

allowance, or payment of any early termination fee under the Tranche C and Tranche D exit facilities.

g.     **Prentice's Waiver of Rights in Goody's II Chapter 5 Actions:** Prentice agreed to waive any right or claim to receive any proceeds from Avoidance Actions arising from the filing of the Goody's II bankruptcy cases.

h.     **Establish Supplemental Administrative Claim Bar Date in Goody's I Cases:** To ensure that the Administrative Reserve Increase will be equitably distributed amongst all creditors in the Goody's I cases who hold an accrued and unpaid administrative claim, the Plan Administrator was permitted to set a new administrative claim bar date of June 1, 2009, applicable to those entities with claims for (i) goods and/or services provided after June 8, 2008 but before October 20, 2008 for which the entity supplying such goods and/or services has not received payment and (ii) unpaid cure costs associated with any and all contracts assumed and assigned under the Plan.

i.     **Releases of Prentice and the Goody's I Plan Administrator:** The Settlement provides for the waiver and release of any and all claims against the Goody's I Plan Administrator and Prentice, arising out of, in connection with, or related to the conduct of the business of the Goody's I Debtors, the Goody's I cases, the Debtors or the Goody's I Plan. To the extent permissible by law, such releases are applicable to the Goody's I Debtors, the Debtors, the Ad Hoc Committee, the Committee and all parties in interest that received notice of the Settlement and had an opportunity to object.

j.     **Reimbursement of Fees and Expenses of Ad Hoc Committee:** The Debtors and Prentice agreed to support the allowance of an administrative claim pursuant to section 503(b) of the Bankruptcy Code for counsel and local counsel to the Ad Hoc Committee in an amount equal to the actual, reasonable fees and expenses incurred in connection with (i) their participation in pre-petition efforts to organize vendors of Goody's I and Goody's II in an effort to reach a consensual out-of-court solution, (ii) their participation in the pre-petition sale process, including the auction of substantially all of the Debtors' assets and (iii) filing, litigating, prosecuting, negotiating and settling the Motion to Dismiss.

k.     **Addendum Terms:** Subsequent to the filing of a motion to approve the Settlement, the parties agreed to the following additional terms. The early termination fee payable to the Prentice Entities under the Tranche C exit facility shall be reduced by fifty percent to $500,000, which amount $500,000 shall constitute an allowed Tranche C Obligation (as that term is defined in the Settlement). Upon payment in full of the Tranche C

Obligations, the Prentice Entities agreed to permit the Debtors to use the Prentice Entities' cash collateral in the amount of $500,000 to pay allowed unsecured claims, including, but not limited to, allowed priority and allowed general unsecured claims, in the Debtors' cases. Further, the first $250,000 of any amounts payable to the Plan Administrator under provision (e)(ii) of the Settlement shall be granted, gifted, and transferred by the Plan Administrator, on behalf of the holders of Class 8 Claims in the Goody's I Cases, to be used solely to pay the Debtors' Allowed Unsecured Claims. Finally, the Prentice Entities agreed to permit the Debtors to use the first $250,000 of any recovery resulting from a successful challenge to, or reduction of, the early termination fees previously paid to General Electric Capital Corporation and GB Merchant Partners, LLC under the applicable loan and credit documents, after reimbursement to the Debtors' estates of any and all expenses related to the investigation, prosecution, settlement, or other resolution resulting in a reduction of the GE/GB Early Termination Fees (including, but not limited to legal expenses incurred by counsel to the Committee), to pay the Debtors' Allowed Unsecured Claims.

Through the compromises set forth in the Settlement, the Debtors accomplished, at a minimum, the following: (i) substantially increasing the funds available to satisfy outstanding administrative obligations under the Goody's I Plan; (ii) avoiding further dissipation of the Debtors' assets as a result of fees and expenses to be incurred by extensive discovery and a fact-intensive trial to determine whether the Goody's I Plan was substantially consummated; and (iii) permitting the Goody's II cases to proceed in an effort to maximize the value of the Debtors' remaining assets for an equitable distribution amongst creditors from both the Goody's I and Goody's II bankruptcy estates.

On or about March 6, 2009, the Bankruptcy Court approved the Settlement [D.I. 449]. The Office of the United States Trustee subsequently filed a notice of appeal from the order approving the settlement (the "Appeal") [D.I. 478] and designated items for inclusion in the record [D.I. 535]. The Appeal before the United States District Court for the District of Delaware is still pending.

The Debtors have made each of the payments outlined above as required pursuant to the Settlement. Thus, all obligations under the Tranche C and Tranche D exit facilities have been satisfied pursuant to the Settlement and no further payment on account of the obligations under the Tranche C and Tranche D exit facilities are required.

## 5. The GOB Sales

On the Petition Date, the Debtors filed the *Emergency Motion of the Debtors for Entry of an Order (I) Approving Assumption of Agency Agreement Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (II) Granting Interim Authorization for the Debtors to Incur Post-Petition Secured Indebtedness in Relation Thereto, (III) Granting Interim Approval of Security Interests and Superpriority Claims Pursuant to Sections 105(A), 361, 364(C), 364(D) and 364(E) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, (IV) Approving*

*Store Closing Sales Free and Clear Of Liens, Claims and Encumbrances Pursuant to Sections 105(A) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004 and 9014 and (V) Granting Related Relief* [D.I. 13].

An agreement (the "Agency Agreement"), as modified on the record at the hearing held on January 15, 2009, was effective as of January 6, 2009. On January 21, 2009, the Bankruptcy Court entered the *Order (I) Approving Assumption of Agency Agreement, (II) Granting Approval of Superpriority Administrative Claims and Security Interests, (III) Approving Store Closing Sales Free and Clear of Liens, Claims and Encumbrances and (IV) Granting Related Relief* [D.I. 122].

Pursuant to the court-approved Agency Agreement, the agent acted as the Company's exclusive agent (the "Agent") for the purpose of conducting going-out-of-business store closing sales (the "GOB Sales") at all of the Company's retail locations and disposing of the Company's inventory, furniture, fixtures and equipment, free and clear of all liens, claims, or encumbrances. The Agent has concluded the GOB Sales pursuant to the Agency Agreement.

### 6. Sale, Rejection and Other Disposition of the Debtors' Assets

Pursuant to an Order dated February 5, 2009, the Debtors established procedures for the sale of certain miscellaneous assets outside the ordinary course of business and free and clear of liens, claims, encumbrances, and other interests (the "Miscellaneous Assets Order") [D.I. 218]. Pursuant to Miscellaneous Assets Order, the Debtors have consummated sales for various miscellaneous assets [D.I. 228, 287, and 519]. Furthermore, pursuant to an Order dated March 18, 2009, the Debtors privately sold certain spring merchandise free and clear of liens, claims, encumbrances, and other interests [D.I. 507].

On February 5, 2009, the Debtors filed a motion seeking approval to, among other things, conduct an auction to sell certain leases and intellectual property (the "IP Assets") [D.I. 221], which was approved by the Bankruptcy Court [D.I. 284]. The Debtors received credit bids for five of the leases, which were subsequently approved by the Bankruptcy Court [D.I. 381, 382, and 411], but did not receive any bids for the IP Assets. Thereafter, the Debtors adjourned the auction with respect to the IP Assets and obtained court-approval to retain Streambank to assist the Debtors in the marketing of the IP Assets [D.I. 549]. On June 8, 2009, the Bankruptcy Court entered the *Third Order (A) Setting (1) Deadline to Bid on Debtors' Interest in Certain Intellectual Property, (2) Date to Conduct an Auction, and (3) Hearing Date for Approval of the Auction and (B) Granting Related Relief* (the "Bidding Procedures Order") [D.I. 704], approving, among other things, certain proposed procedures in connection with the auction (the "Auction"). The further extended the deadline to submit bids on the IP Assets to June 15, 2009 at 5:00 p.m. [D.I. 709] and held the Auction on June 16, 2009.

On June 22, 2009, the Bankruptcy Court entered the *Order (A) Approving the Sale of Certain of the Debtors' Intellectual Property (Duck Head) Free and Clear of All Liens, Claims, Encumbrances and Other Interest and (B) Granting Related Relief* (the "Duck Head Sale Order") [D.I. 728]. By the Duck Head Sale Order, the Bankruptcy Court approved the sale of the Debtors' intellectual property rights associated with the Duck Head private label brand to D.H.I.P. Holdings, LLC for a purchase price of $2,650,000. On June 22, 2009, the Bankruptcy

Court also entered the *Order (A) Approving the Sale of Certain of the Debtors' Intellectual Property (Goody's) Free and Clear of All Liens, Claims, Encumbrances and Other Interest and (B) Granting Related Relief* (the "Goody's Sale Order") [D.I. 729]. By the Goody's Sale Order, the Bankruptcy Court approved the sale of the Debtors' intellectual property rights associated with the Goody's store brand to Specialty Retailers, Inc. for a purchase price of $300,000.

In addition to terminating certain equipment leases and contracts, the Debtors have rejected over 275 non-residential real property leases for their retail stores, along with numerous other executory contracts that no longer have any material economic value to the Debtors or their estates given the conclusion of the GOB Sales and the resulting winding down of the Debtors' business affairs. In total, the Debtors have filed thirteen motions seeking authority to reject various leases of non-residential real property and executory contracts and to abandon certain personal property [D.I. 194, 412, 413, 414, 415, 416, 469, 523, 524, 557, 618, 684, and 747 ], which have all been approved by the Bankrutpcy Court [D.I. 383, 536, 537, 538, 539, 540, 541, 595, 596, 603, 745, and 776].

On March 25, 2009, the Debtors also filed a motion seeking authority to abandon or destroy certain documents and records [D.I. 522], which was approved by the Bankruptcy Court on April 24, 2009 [D.I. 610].

## 7.    Employee Issues

Recognizing that their employees were essential to ensure the continued operation of the Debtors' business through the chapter 11 process, on July 13, 2009, the Debtors filed their *Motion of the Debtors for Order Under Sections 105(a), 363, 507(a) and 1107 of the Bankruptcy Code and Fed. R. Bankr. P. 6003, Authorizing Debtors,* Inter Alia, *to Pay Prepetition Wages, Compensation, and Employee Benefits* (the "Employee Motion") [D.I. 7]. By the Employee Motion, the Debtors requested the continuation of payment of wages, salaries, and employee benefits (the "Prepetition Employee Obligations") for their approximate 8,200 employees. On January 15, 2009, the Bankruptcy Court entered its *Order Under Sections 105(a), 363, 507(a) and 1107 of the Bankruptcy Code and Fed. R. Bankr. P. 6003, Authorizing Debtors,* Inter Alia, *to Pay Prepetition Wages, Compensation, and Employee Benefits* (the "Employee Order") [D.I. 75] granting the Employee Motion.

On March 12, 2009, the Debtors filed the *Motion of the Debtors for an Order (I) Approving the Executive Incentive Plan, (II) Approving the Non-Insider Retention Plan, and (III) Authorizing Payments Thereunder Pursuant to §§ 363(b) and 503(c) of the Bankruptcy Code* (the "Incentive Motion") [D.I. 468]. On March 30, 2009, the Bankruptcy Court approved the Incentive Motion [D.I. 550].

## 8.    Administrative Expenses

Administrative expenses payable in the Bankruptcy Cases include, among other things, fees and expenses of attorneys, accountants, financial advisors and other professionals retained by the Debtors and the Committee and the various counsel and advisors to the Debtors' Prepetition and Postpetition Lenders (collectively, the "Case Professionals"). These fees are generally calculated as the product of the customary hourly billing rates and the aggregate hours

billed by such Case Professionals. Some financial advisors are paid a monthly fee plus expenses incurred or other approved basis, rather than on an hourly basis.

Additional administrative expenses include the fees payable to the U.S. Trustee. These fees have been paid by the Debtors as they have accrued during the pendency of the Bankruptcy Cases. Any unpaid fees due to the U.S. Trustee will be paid in full on the Effective Date. In addition, the Debtors have paid in the ordinary course the fees and expenses of Logan for services rendered as the Debtors' claims agent. Any unpaid fees and expenses of Logan will be paid in full on the Effective Date.

### 9.    The Debtors' Schedules and Bar Dates

On February 20, 2009, the Bankruptcy Court granted the Debtors' motion to extend the Debtors' time to file the Schedules of Assets, Liabilities and Executory Contracts, and the Statement of Financial Affairs (collectively, the "Schedules"). The Debtors' Schedules were filed with the Bankruptcy Court on March 16, 2009 [D.I. 479–492]. On April 17, 2009, the Bankruptcy Court entered an order setting a bar date of June 22, 2009 for the filing of certain prepetition proofs of claim [D.I. 590] and the Debtors filed a notice of an initial bar date of June 1, 2009 for the filing of certain administrative expense proofs of claim [D.I. 591].

### 10.    WARN Act Litigation Claims

On January 27, 2009, a former employee of the Debtors, on his own behalf and on behalf of other similarly situated former employees, commenced an action for damages (Adv. Pro. No. 09-50043) on account of alleged violations of the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, et seq. (the "WARN Act"), which resulted from Debtor Goody's, LLC's January 12, 2009 reduction in workforce. Plaintiff amended his complaint on February 12, 2009 to add allegations that to the extent any employee was terminated after the Petition Date, they should be allowed to participate as a class member and any relief they are entitled to under the WARN Act should be given administrative priority pursuant to § 503(b)(1)(A) of the Bankruptcy Code.

On October 5, 2009, the Bankruptcy Court approved the parties' stipulated order certifying a class comprising of all non-bargaining unit employees terminated without cause within 30 days of the January 12, 2009 reduction in workforce at the Knoxville, Tennessee facility.

In this action, Plaintiff seeks (i) payment of up to 60 days' wages and/or benefits to class members who were terminated before the Petition Date, which would have priority under §§ 507(b)(4) and/or (5) of the Bankruptcy Code (with the balance not entitled to wage priority payable as a general unsecured claim), and (ii) administrative priority status for any wages and/or benefits owed to class members who were terminated after the Petition Date (the "WARN Act (Class) Claims"). Plaintiff asserts that there are approximately 480 class members.

On May 26, 2009 and June 4, 2009, Workers United f/k/a UNITE HERE (the "Union") filed 4 class proofs of claims on behalf of its members. The Union filed: (i) two class proofs of claim against Goody's for failure to provide adequate notice under the WARN Act (Claim No. 1053) and another claim for unpaid wages and benefits (Claim No. 1383) and (ii) two

class proofs of claim against Goody's TNDC, L.P., one for failure to provide adequate notice under the WARN Act (Claim No. 1054) and another for unpaid wages and benefits (Claim No. 1384) (collectively, the "WARN Act (Union) Claims" and together with the WARN Act (Class) Claims, the "WARN Act Claims").

The Debtors dispute that any violation of the WARN Act occurred, but in the interest of avoiding litigation the Debtors, in consultation with the Committee, have engaged in extensive settlement negotiations with Lankenau & Miller LLP, The Gardner Firm, P.C., and Margolis Edelstein, which represent the holders of the WARN Act (Class) Claims and representatives of the holders of the WARN Act (Union) Claims, in an attempt to resolve all WARN Act Claims. Based upon these negotiations, and pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan provides for the compromise and settlement of all WARN Act Claims.

Specifically, each holder of a WARN Act (Union) Claim shall have an Allowed WARN Act (Union) Priority Claim plus an Allowed WARN Act (Union) Settlement Claim. The Debtors will withold and pay accordingly any withholding taxes pursuant to applicable law. For more information on the WARN Act (Union) Settlement, see Article III.C.1 of this Disclosure Statement, "THE DEBTORS' CHAPTER 11 PLAN—Settlements—WARN Act (Union) Settlement."

Moreover, each holder of a WARN Act (Class) Claim shall have an Allowed WARN Act (Class) Priority Claim plus an Allowed WARN Act (Class) Settlement Claim. The Debtors, however, will withhold and pay accordingly (i) any withholding taxes pursuant to applicable law, (ii) the holder's Pro Rata Share of the WARN Act Counsel's Fees, and (iii) the holder's Pro Rata Share of the WARN Act Service Payment. For more information on the WARN Act (Class) Settlement, see Article III.C.2 of this Disclosure Statement, "THE DEBTORS' CHAPTER 11 PLAN—Settlements—WARN Act (Class) Settlement."

## III.    THE DEBTORS' CHAPTER 11 PLAN

The summary of the Plan contained herein is qualified in its entirety by reference to the Plan and the exhibits to this Disclosure Statement and the Plan. It is the Plan and orders entered by the Bankruptcy Court and not this Disclosure Statement that govern the rights and obligations of the parties.

### A.    Classification and Treatment of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan of liquidation must designate classes of claims and equity interests, each of which must contain only substantially similar claims or equity interests. Subject to Article XIII of the Plan, the Plan constitutes a single plan of liquidation for all Debtors. The following describes the significant Claims and Equity Interests in the Debtors' Bankruptcy Cases and the manner in which they are classified and treated under the Plan.

Consistent with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not included in any Classes of Claims or Equity

Interests. As defined in the Plan, "Administrative Expense Claims" are any Claims for costs and expenses of administration of the Bankruptcy Cases allowed under sections 503, 507(a)(1) or 507(b) of the Bankruptcy Code, and all fees and costs assessed against the Estate pursuant to 28 U.S.C. § 1930. Also as defined in the Plan, "Priority Tax Claims" are any Claims entitled to priority in payment under section 502(i) or section 507(a)(8) of the Bankruptcy Code.

## 1. Classification

The Plan provides for the classification and treatment of six Classes of Claims and Interests (treating the Debtors as a single entity). For more information regarding the proposed substantive consolidation of the Debtors for purposes of voting, distributions and confirmation of the Plan, see Article III.E.4, "Substantive Consolidation." A Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and will be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of such different Class.

### (a) Class 1—Priority Claims

Class 1 Claims consist of all Priority Claims. A Priority Claim is all or a portion of any Claim entitled to priority in payment under section 507(a) of the Bankruptcy Code, excluding any Claim that is an Administrative Expense Claim, a Priority Tax Claim, an Allowed WARN Act (Union) Priority Claim, or an Allowed WARN Act (Class) Priority Claim.

### (b) Class 2—Secured Claims

Class 2 Claims consist of all Secured Claims. A Secured Claim is a Claim that is secured (i) by a Lien that is valid, perfected and enforceable under the Bankruptcy Code or applicable non-bankruptcy law or by reason of a Final Order; or (ii) as a result of rights of setoff under section 553 of the Bankruptcy Code, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the holder's interest in the Estate's interest in such property or to the extent of the amount subject to such setoff, as the case may be.

### (c) Class 3—Unsecured Claims

Class 3 Claims consist of all Unsecured Claims, which are all Claims that are not Administrative Expense Claims, Priority Claims, Priority Tax Claims, Secured Claims, Claims held by the WARN Act Claimants, or Equity Interests. The Debtors' Unsecured Claims fall into two categories, general unsecured trade claims and litigation claims. The Debtors list various trade and other unsecured claims in the Schedules.

### (d) Class 4—Equity Interests

Class 4 consists of all Equity Interests, defined as any ownership interest or share in the Debtors (including, without limitation, all options, warrants or other rights to obtain such an interest or share in the Debtors) whether or not transferable, preferred, common, voting, or denominated "stock" or a similar security.

(e) **Class 5A—WARN Act (Union) Claims**

Class 5A consists of all Allowed WARN Act (Union) Priority Claims and Allowed WARN Act (Union) Settlement Claims against the Debtors.

(f) **Class 5B—WARN Act (Class) Claims**

Class 5A consists of all Allowed WARN Act (Class) Priority Claims and Allowed WARN Act (Class) Settlement Claims.

The following chart sets forth the Debtors' estimate of the amounts of the Claims:

## Summary Chart of Claims and Equity Interests

| Class | Estimated Amount | Estimated Recovery |
|---|---|---|
| Administrative Expense Claims | $1,731,000 | 100% |
| Priority Tax Claims | $3,867,000 | 100% |
| Class 1 - Priority Claims | $1,241,000 | 100% |
| Class 2 - Secured Claims | $540,000 | 100% |
| Class 3 - Unsecured Claims | $114,386,000 | 0.5% |
| Class 4 - Equity Interests | Not estimated | No Recovery |
| Class 5A - WARN Act (Union) Claims | Allowed WARN Act (Union) Priority Claims | |
| | $205,000 | 100% |
| | Allowed WARN Act (Union) Settlement Claims | |
| | $673,000 | 0.01% |
| Class 5B - WARN (Class) Claims | Allowed WARN Act (Class) Priority Claims | |
| | $804,000 | 100% |
| | Allowed WARN Act (Class) Settlement Claims | |
| | $2,680,000 | 0.01% |

The Allowed amount of Claims may be materially higher or lower than the estimated amounts. The applicable bar dates for filing all such Claims have not yet passed. Until such time, the maximum amount of Claims cannot be determined.

### B.    Treatment of Claims and Interests

A Claim is entitled to a distribution only to the extent that the Claim is an "Allowed" and entitled to distributions under the Plan. "Allowed" means, as it relates to any Claim, a Claim (i) which has been scheduled as undisputed, noncontingent and liquidated in the Schedules and as to which no proof of Claim has been timely filed (subject to each Debtor's right to amend the Schedules) and as to which no objection or request for estimation has been filed on or before any Claim objection deadline, if any, set by the Bankruptcy Court or the expiration of such other period fixed by the Bankruptcy Court; (ii) as to which a proof of Claim has been properly and timely filed and either (a) no objection thereto has been timely filed, or if an objection has been timely filed, any portion of which is not subject to such objection, or (b) such Claim has been allowed (but only to the extent allowed) by a Final Order of the Bankruptcy Court; or (iii) which has been expressly allowed under the provisions of the Plan. An Allowed Claim will not, for purposes of computation of distributions under the Plan, include interest on such Claim from and after the Petition Date or include any penalty on such Claim.

A number of Claimholders will file claims in excess of their scheduled amounts, and certain Claimholders that are not listed in the Schedules (including parties to contracts and leases that have been or will be rejected by the Debtors as provided for under the Bankruptcy Code) will file Claims against the Debtors. The Debtors will review these filed Claims, attempt to reconcile them with their books and records and file objections as necessary.

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not included in any Classes of Claims or Equity Interests. Each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of and in exchange for such Claim (i) the unpaid amount of such Allowed Administrative Expense Claim, without interest, in Cash, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date that is ten (10) Business Days after such Claim becomes an Allowed Administrative Expense Claim; or (ii) such other treatment as may be agreed upon in writing by the holder of such Claim and the Debtors in consultation with the Committee or the Post-Effective Date Committee, as applicable.

Each holder of an Allowed Priority Tax Claim shall receive in full satisfaction of and in exchange for such Claim (i) the amount of such Allowed Priority Tax Claim, without interest, in Cash, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date that is ten (10) Business Days after such Claim becomes an Allowed Priority Tax Claim; or (ii) such other treatment as may be agreed upon in writing by the holder of such Claim, the Liquidating Agent in consultation with the Post-Effective Date Committee.

The following is a summary of the manner in which the Classes of Claims and Equity Interests are treated under the Plan. The Debtors believe that the treatment afforded all

Classes of Claims and Equity Interests under the Plan fully comports with the requirements of the Bankruptcy Code and case law.

### 1. Priority Claims (Class 1)

Holders of Allowed Priority Claims are unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are not entitled to vote on the Plan and deemed to accept the Plan. Each holder of an Allowed Priority Claim shall receive in full satisfaction of and in exchange for such Claim (i) the amount of such Allowed Priority Claim, without interest, in Cash, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date that is ten (10) Business Days after such Claim becomes an Allowed Priority Claim; or (ii) such other treatment as may be agreed upon in writing by the holder of such Claim, the Debtors, and the Committee.

### 2. Secured Claims (Class 2)

Holders of Allowed Secured Claims (Class 2) are unimpaired and, pursuant to section 1126(f) of the Bankruptcy Code, are not entitled to vote on the Plan and deemed to accept the Plan. Each holder of an Allowed Secured Claim shall receive in full satisfaction of and in exchange for such Claim either (i) Cash equal to the amount of such Allowed Secured Claim or such other amount as may be agreed upon by the Debtors as the holder of such claim on or as soon as practicable after the later of (a) the Effective Date, or (b) the date that is ten (10) Business Days after such Claim becomes an Allowed Secured Claim, and all Liens and security interests asserted by the holder of such Allowed Secured Claim shall be extinguished and of no further force or effect, or (ii) a return of the collateral or other property that secures the Allowed Secured Claim, on or as soon as practicable after the later of (a) the Effective Date, or (b) the date that is ten (10) Business Days after such Claim becomes an Allowed Secured Claim.

### 3. Unsecured Claims (Class 3)

Holders of Allowed Unsecured Claims (Class 3) are impaired and entitled to vote on the Plan. Holders of Allowed Unsecured Claims shall receive in full satisfaction of and in exchange for such Claims, their Pro Rata Share of any Cash distribution from the Estate Assets to holders of Allowed Unsecured Claims. The timing and nature of the distributions to be made to the holders of Allowed Unsecured Claims shall be governed by Article VII of the Plan. For further information regarding the timing nature of such distributions, see Article VII of the Plan, "Funding of Distributions and Provisions for Treatment of Disputed Claims."

### 4. Equity Interests (Class 4)

On the Effective Date, all Equity Interests of the Debtors will be canceled, annulled and voided, and holders thereof will be entitled to no distribution whatsoever under the Plan or in the Bankruptcy Cases on account of such Equity Interests. Class 4 is impaired under the Plan, and the members of such Class will not receive or retain any property under the Plan or the Bankruptcy Cases on account of their Equity Interests. Accordingly, the members of Class 4 are presumed to have rejected the Plan under section 1126(g), and will not be entitled to vote.

### 5. WARN Act (Union) Claims (Class 5A)

Holders of WARN Act (Union) Claims (Class 5A) are impaired and entitled to vote on the Plan. Holders of WARN Act (Union) Claims shall receive in full satisfaction of and in exchange for such Claims their Pro Rata Share of any Cash distribution of the WARN Act (Union) Settlement Amount. The timing and nature of the distributions to be made to the holders of WARN Act (Union) Claims shall be governed by Article VII of the Plan. For further information regarding the timing nature of such distributions, see Article VII of the Plan, "Funding of Distributions and Provisions for Treatment of Disputed Claims."

### 6. WARN Act (Class) Claims (Class 5B)

Holders of WARN Act (Class) Claims (Class 5B) are impaired and entitled to vote on the Plan. Holders of WARN Act (Class) Claims shall receive in full satisfaction of and in exchange for such Claims their Pro Rata Share of any Cash distribution of the WARN Act (Class) Settlement Amount. The timing and nature of the distributions to be made to the holders of WARN Act (Class) Claims shall be governed by Article VII of the Plan. For further information regarding the timing nature of such distributions, see Article VII of the Plan, "Funding of Distributions and Provisions for Treatment of Disputed Claims."

### C. Settlements

### 1. WARN Act (Union) Settlement

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the WARN Act (Union) Settlement and authorize parties to take all actions that are necessary or appropriate to implement and give effect to the WARN Act (Union) Settlement. Each holder of a WARN Act (Union) Claim shall be entitled to the treatment provided in Section 4.5 of the Plan and all WARN Act (Union) Claims shall be deemed satisfied in full by such treatment.

The holders of WARN Act (Union) Claims shall be entitled an Allowed WARN Act (Union) Priority Claim, which is a gross, Allowed Claim equivalent to two (2) weeks of pay and benefits and shall be treated as a wage priority claim in accordance with 11 U.S.C. § 507(a)(4). In addition, each holder of a WARN Act (Union) Claim shall be entitled to an Allowed WARN Act (Union) Settlement Claim, which is an Allowed Claim for the Claimant's Pro Rata Share[4] of the following distributions from the Unsecured Estate Funds:

>  (a) After the first $492,000 of the Unsecured Estate Funds have been distributed to the holders of Allowed Unsecured Claims, each WARN

---

[4] For purposes of determining the Pro Rata Share of the Allowed WARN Act (Union) Settlement Claim, the Class shall mean Class 5 in its entirety, including Class 5A and Class5B.

Act Claimant shall be entitled to a payment equivalent to one (1) week of pay and benefits;

(b) Following all distributions made in accordance with paragraph (a) above, any remaining Unsecured Estate Funds shall be distributed as follows: twenty-five percent (25%) of such funds to the holders of Allowed Unsecured Claims and seventy five-percent (75%) of such funds to the WARN Act Claimants.

Payments to any individual holder of a WARN Act (Union) Claim shall not exceed the Priority Cap or the Claimant's Maximum WARN Claim, whichever is lesser. Other than the Allowed WARN Act (Union) Settlement Claims, the holders of Allowed WARN Act (Union) Settlement Claims shall have no Claims against the Unsecured Estate Funds and shall not share in any distributions to holders of Allowed Unsecured Claims made pursuant to the Plan, including subparagraphs (a) and (b) above.

The Union shall with withdraw its four proofs of claim within thirty (30) days of entry of the Confirmation Order and on the occurrence of the Effective Date, the holders of WARN Act (Union) Claims shall be deemed to have released all claims, other than those Allowed pursuant to the Plan, against the Debtors that relate to or are based on the WARN Act, severance pay, or benefits based on or arising out of any federal, state, or local statute, ordinance, or regulation relating to the termination of employees.[5]

## 2.    WARN Act (Class) Settlement

Pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of the WARN Act (Class) Settlement and authorize parties to take all actions that are necessary or appropriate to implement and give effect to the WARN Act (Class) Settlement. Each holder of a WARN Act (Class) Claim, as listed on Exhibit A to the Plan, shall be entitled to the treatment provided in Section 4.6 of the Plan and all WARN Act (Class) Claims shall be deemed satisfied in full by such treatment.

The holders of WARN Act (Class) Claims shall be entitled to an Allowed WARN Act (Class) Priority Claim, which is a gross, Allowed Claim equivalent to two (2) weeks of pay and benefits and shall be treated as a wage priority claim in accordance with 11 U.S.C. § 507(a)(4). In addition, each holder of a WARN Act (Class) Claim shall be entitled to an

---

[5] Such withdrawal and release of Claims does not impact the rights of Union members who are not WARN Act Claimants and who have asserted claims for unpaid vacation and personal days.

Allowed WARN Act (Class) Settlement Claim, which is an Allowed Claim for the Claimant's Pro Rata Share[6] of the following distributions from the Unsecured Estate Funds:

> (a) After the first $492,000 of the Unsecured Estate Funds have been distributed to the holders of Allowed Unsecured Claims, each WARN Act Claimant shall be entitled to a payment equivalent to one (1) week of pay and benefits;
>
> (b) Following all distributions made in accordance with paragraph (a) above, any remaining Unsecured Estate Funds shall be distributed as follows: twenty five percent (25%) of such funds to the holders of Allowed Unsecured Claims and seventy five percent (75%) of such funds to the WARN Act Claimants.

Payments to any individual WARN Act (Class) Claimant shall not exceed the Priority Cap or the Claimant's Maximum WARN Claim, whichever is lesser. Other than the Allowed WARN Act (Class) Settlement Claims, the holders of Allowed WARN Act (Class) Settlement Claims shall have no claims against the Unsecured Estate Funds and shall not share in any distributions to holders of Allowed Unsecured Claims made pursuant to the Plan, including subparagraphs (a) and (b) above. Payment of the WARN Act Counsel's Fees and WARN Act Service Payment shall be paid by the Debtors from any WARN Act (Class) Settlement Amounts.

On the occurrence of the Effective Date, the holders of WARN Act (Class) Claims shall be deemed to have released all claims, other than those Allowed pursuant to the Plan, against the Debtors that relate to or are based on the WARN Act, severance pay, or benefits based on or arising out of any federal, state, or local statute, ordinance, or regulation relating to the termination of employees.

### D. Funding of Distributions and Provisions for Treatment of Disputed Claims

#### 1. Liquidation of Assets

The Debtors estimate that they will have at least $7.4 million in Cash plus any amounts received from refunds, deposit, credits, and other assets on about the Effective Date to make the distributions contemplated under the Plan. Section 7.1 of the Plan provides that on and after the Effective Date, the Debtors, through the Liquidating Agent, may, without further approval of the Bankruptcy Court, use, sell, assign, transfer, abandon or otherwise dispose of at a public or private sale any of the Debtors' remaining tangible or intangible assets for the purpose of liquidating and converting such assets to Cash, making distributions and fully consummating the Plan. Any proposed use, sale, assignment, transfer, abandonment, or other disposition by the Liquidating Agent of any of the Debtors' remaining tangible or intangible assets shall be made in

---

[6]     For purposes of determining the Pro Rata Share of the Allowed WARN Act (Class) Settlement Claim, the Class shall mean Class 5 in its entirety, including Class 5A and Class5B.

consultation with the Post-Effective Date Committee of any such proposed use, sale, assignment, transfer, abandonment or other disposition.

## 2. Disbursing Agent

Section 7.4 of the Plan provides that the Liquidating Agent will make all distributions and payments provided under the Plan for and on behalf of each applicable Debtor. The Liquidating Agent will not make the distributions or payments described in section 7.2, 7.5, 7.5.1, 7.5.2, or 7.6 of the Plan without the prior approval of the the Post-Effective Date Committee.

## 3. The Initial Distribution

On the Effective Date, or as soon thereafter as is practicable, the Liquidating Agent, on behalf of the Debtors, shall pay, in full and in Cash, (a) all Allowed Administrative Expense Claims, (b) all Allowed Priority Tax Claims, (c) all Allowed Priority Claims that are to be satisfied pursuant to section 4.1(i) of the Plan, (d) all Allowed Secured Claims that are to be satisfied pursuant to section 4.2(i) of the Plan, (e) all Allowed Warn Act (Union) Priority Claims that are to be satisfied pursuant to Section 4.5 of the Plan, and (f) all Allowed Warn Act (Class) Priority Claims that are to be satisfied pursuant to Section 4.6 of the Plan. The Debtors shall provide to each holder of an Allowed Secured Claim that is being treated in accordance with section 4.2(ii) of the Plan, the property securing such Allowed Secured Claim. After payment of the amounts set forth in section 7.2 of the Plan and the establishment and funding of the Post-Confirmation Operating Account and the Disputed APS Claims Reserve in accordance with section 7.3 of the Plan, the Liquidating Agent, on behalf of the Debtors, may pay, in the following order and in accordance with Article IX of the Plan, from the amounts deposited into the Distribution Reserve: (i) holders of Unsecured Claims whose Claims are Allowed as of the Effective Date their Pro Rata share of the first $492,000 of Unsecured Estate Funds, (ii) each WARN Act Claimant one (1) week of pay and benefits, and (iii) twenty-five percent (25%) of any remaining Unsecured Estate Funds to holders of Unsecured Claims whose Claims are Allowed as of the Effective Date and seventy-five percent (75%) of any remaining Unsecured Estate Funds to the WARN Act Claimants. After giving effect to the Cash distributions described in this Section 7.2, the Liquidating Agent shall deposit all remaining Cash in its possession, custody, or control in the reserves and accounts established by the Plan, as described in section 7.3 of the Plan.

## 4. Timing of Subsequent and Final Distributions

Section 7.5.1 of the Plan provides that Following the Initial Distribution, on each Payment Date, as appropriate, or on the Final Distribution Date, the Liquidating Agent shall pay each holder of an Allowed Unsecured Claim, Allowed WARN Act (Union) Settlement Claim, and Allowed WARN Act (Class) Settlement Claim its Pro Rata Share, in accordance with the WARN Act Settlements, of the amounts in the Distribution Reserve, with the amount of such Claim and Available Cash calculated as of the date that is fifteen (15) Business Days prior to such Payment Date. Distributions in accordance with this section shall continue until the Final Distribution Date. The Liquidating Agent, in consultation with the Post-Confirmation

Committee, reserves the right to determine when and if to make a subsequent distribution under the Plan.

Section 7.5.2 of the Plan provides that the Final Distribution shall have occurred when, after giving effect to a distribution of Available Cash, there are remaining Estate Assets with a de minimis value and the Liquidating Agent and the Post-Confirmation Committee determine, or the Bankruptcy Court otherwise orders after notice and a hearing, that such distribution is the final distribution to Claimants under the Plan.

**5.       Investment of Disputed Claims Reserve.**

Section 7.9 of the Plan provides that the Debtors through the Liquidating Agent shall be permitted, from time to time, to invest all or a portion of the Cash in the Disputed Claims Reserve in United States Treasury Bills, interest-bearing certificates of deposit, tax exempt securities, money market accounts or investments permitted by section 345 of the Bankruptcy Code or otherwise as authorized by the Bankruptcy Court, using prudent efforts to enhance the rates of interest earned on such Cash without inordinate credit risk or interest rate risk. All interest earned on such Cash shall be held in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of such Disputed Claims Reserves, including taxes payable on such interest income, if any, shall be transferred out of such Disputed Claims Reserves and, in the discretion of the Liquidating Agent and the Post-Effective Date Committee, be used to satisfy the costs of administering and fully consummating the Plan or become Available Cash for distribution in accordance with the Plan.

**6.       Minimum Distribution**

Section 7.10 of the Plan provides that the Liquidating Agent will not be required to distribute less than $100.00 to any Claimant unless either a request therefor is made in writing to the Debtors by the Claimant with respect to such Claim or the Liquidating Agent after consultation with the Post-Effective Date Committee so determines to make such payment in its sole and absolute discretion.

**7.       Undeliverable Distributions**

Section 7.11 of the Plan provides that if any distribution to a Claimant is returned as undeliverable, no further distributions shall be made to such Claimant unless and until the Debtors are notified in writing of such Claimant's then-current address. Undeliverable distributions made by the Liquidating Agent and any other unclaimed distributions shall be returned to the Debtors and shall remain in the possession of the Debtors until such time as a distribution becomes deliverable. Any unclaimed distributions shall be Available Cash for distribution as part of the Final Distribution.

**8.       Setoff**

Section 7.12 of the Plan provides that in accordance with the Plan, section 553 of the Bankruptcy Code and applicable non-bankruptcy law, the Debtors may, but shall not be required to, set off against any Claim, and the distributions to be made pursuant to the Plan with respect to such Claim, claims of any nature whatsoever that the Debtors or the Estate may have

against the holder of such Claim. Notwithstanding the foregoing, the failure to effect such a setoff or the allowance of any claim hereunder will not constitute a waiver or release by the Debtors or the Estates of any such claim, right or cause of action against such holder.

### 9. Distributions Paid to Holders of Record

Section 7.13 of the Plan provides that all distributions to be made pursuant to the Plan may be made by the Liquidating Agent to the holder of record as of the Record Date.

### E. Implementation and Means of Consummating the Plan

### 1. Limited Survival and Ultimate Dissolution of Corporate Entities

Section 8.1 of the Plan provides that from and after the Confirmation Date, the Debtors shall continue in existence pursuant to the terms of the Plan for the purposes of (i) winding up their affairs as expeditiously as reasonably possible, (ii) liquidating, by converting to Cash or other methods, any remaining Estate Assets, as expeditiously as reasonably possible, (iii) enforcing and prosecuting claims, interests, rights and privileges of the Debtors, including, without limitation, the prosecution of Estate Actions in conjunction with the marshaling of the Debtors' assets, (iv) resolving Disputed Claims, (v) administering the Plan and (vi) filing appropriate tax returns.

Once the Liquidating Agent, in consultation with the Post-Effective Date Committee, determines that (i) the Final Distribution Date is approaching or has passed or (ii) a reasonable business justification exists to dissolve a Debtor, other than Goody's, LLC, prior to the approachment of the Final Distribution Date, the Liquidating Agent shall dissolve such Debtor by filing a certification to that effect with the Bankruptcy Court and a certificate of dissolution of the Debtor with the Secretary of State or other authorized authority under the laws of the state where such Debtor is incorporated and shall take all other actions necessary or appropriate to effect the dissolution of the Debtor under the laws of the state where each Debtor is incorporated and under the laws of any other jurisdiction where formal dissolution or other steps are required. All applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the Debtors as provided herein, without the payment of any fee, tax, or charge and without need for the filing of reports or certificates.

### 2. Governance of Estate Assets

All officers and directors of the Debtors serving immediately prior to the Effective Date shall be deemed to have been terminated or removed as of the Effective Date. From and after the Effective Date, the Liquidating Agent shall be deemed the sole shareholder and shall be appointed as the sole director and officer of each Debtor (and all bylaws, articles or certificates of incorporation, and related corporate documents are deemed amended by the Plan to permit and authorize such appointment). All corporate governance activities of the Debtors shall be exercised by the Liquidating Agent, subject to the terms of the Plan.

### 3. The Liquidating Agent

Each Debtor, through the Liquidating Agent, will be the exclusive trustee of its Estate Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. David Peek shall serve as the Liquidating Agent for the Debtors. Section 8.3.3 of the Plan provides that the fees for the Liquidating Agent, unless modified after the Effective Date by order of the Bankruptcy Court shall be paid, without further order of the Bankruptcy Court, at the rate of $185.00 per hour. Removal of the Liquidating Agent shall be governed according to Section 8.3.4 of the Plan and shall require the consent of a majority of the members of the Post-Effective Date Committee and Bankruptcy Court approval.

#### (a) Responsibilities

Section 8.3.1 of the Plan provides that the responsibilities of the Liquidating Agent will include (i) the receipt, management, supervision, and protection of the Estate Assets for the benefit of the beneficiaries of the Estate Assets; (ii) the investigation, pursuit, initiation, commencement, filing, prosecution and/or enforcement, and if necessary and appropriate, compromise of the objections to, estimations and settlements of Disputed Claims; (iii) the investigation, pursuit, initiation, commencement, filing, prosecution and/or enforcement, and if necessary and appropriate, compromise of the claims and causes of action included among the Estate Assets, but excluding Avoidance Actions against third parties; (iv) calculation, implementation, and making of all distributions to be made under the Plan to holders of Allowed Claims; (v) marketing, selling, leasing, or otherwise disposing of all of the Estate Assets, if any; (vi) filing all required tax returns and paying taxes and all other obligations of the Debtors; (vii) filing all operating reports and paying all fees required by 28 U.S.C. § 1930; and (viii) such other responsibilities as may be vested in the Debtors pursuant to the Plan and orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of the Plan.

#### (b) Powers

Section 8.3.2 of the Plan provides that the powers vested in the Debtors and the Liquidating Agent under the Plan will include, subject to consultation with the Post-Effective Date Committee as provided in the Plan, the power to (i) invest funds; (ii) make distributions provided for in the Plan; (iii) pay taxes and other obligations owed by or from the Estate Assets or incurred by the Debtors; (iv) engage and compensate from the Estate Assets, consultants, agents, employees, attorneys and professional persons to assist the Liquidating Agent or the Debtors with respect to the Debtors' or Liquidating Agent's responsibilities; (v) retain and compensate from the Estate Assets, the services of experienced auctioneers, brokers, and/or marketing agents to assist and/or advise in the sale or other disposition of the Estate Assets; (vi) liquidate and dispose of the Estate Assets; (vii) compromise and settle Claims and Estate Actions; (viii) investigate, pursue, initiate, commence, file, prosecute and/or enforce, and if necessary and appropriate, compromise all adversary proceedings and contested matters (the Estate Actions but excluding the Avoidance Actions) pending in the Bankruptcy Court and in all actions and proceedings pending elsewhere; (ix) in consultation with the Post-Effective Date Committee utilize Estate Assets to purchase appropriate insurance to insure the acts and omissions of the Liquidating Agent, or to insure other Estate Assets; and (x) implement the Plan

and orders of the Bankruptcy Court. The Debtors and the Liquidating Agent shall exercise such powers in accordance with the provisions of the Plan. Without limiting the foregoing, the Liquidating Agent shall have the authority and power, in consultation with the Post-Effective Date Committee, to retain and compensate any former employee, officer and/or director of the Debtors to assist the Liquidating Agent with respect to its responsibilities under the Plan.

### (c)  Termination

Section 8.3.6 of the Plan provides that the duties, responsibilities and powers of the Liquidating Agent will terminate after all causes of action involving the Debtors on behalf of the Estate Assets are fully resolved or waived and all the Estate Assets have been distributed on the Final Distribution Date in accordance with the Plan and a Final Decree has been entered closing the Bankruptcy Cases.

### 4.  Substantive Consolidation

Section 8.5 of the Plan provides that the entry of the Confirmation Order will constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of the Debtors solely for purposes of voting on, confirmation of, and distributions under the Plan. The Plan does not contemplate the substantive consolidation of the Debtors for any other purpose.

Consolidation of the Debtors may be approved by the Bankruptcy Court if necessary or appropriate to provide equitable treatment to all Claimholders in such Classes. In determining whether consolidation of two or more debtors is necessary or appropriate, courts consider, among other factors, whether (i) prepetition the debtors disregarded separateness so significantly that their Claimholders relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition such debtors' assets and liabilities are so scrambled that separating them is prohibitive and hurts all Claimholders. Debtors believe that, upon consideration of the foregoing factors, the Bankruptcy Court will find that substantive consolidation of the Debtors is both necessary and appropriate in the context of these cases.

### 5.  Closing of the Bankruptcy Cases

Section 8.6 of the Plan provides that when all Disputed Claims filed against the Debtors have become Allowed Claims or have been disallowed by Final Order, and all remaining assets of the Debtors have been liquidated and converted into Cash (other than those assets abandoned by the Debtors), and such Cash has been distributed in accordance with the Plan, or at such earlier time as the Debtors and Post-Effective Date Committee deem appropriate, the Debtors or the Liquidating Agent will seek authority from the Bankruptcy Court to close the Bankruptcy Cases in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the Bankruptcy Court.

### F. Other Plan Provisions

#### 1. Conditions Precedent to Confirmation

Section 11.1 of the Plan provides that the following are conditions precedent to the Effective Date of the Plan: (i) the Bankruptcy Court has entered the Confirmation Order, (ii) The Disputed APS Claims Reserve and the Post-Confirmation Operating Account have been funded in accordance with Article VII of the Plan; and (iii) no stay of the Confirmation Order is in effect.

#### 2. The Post-Effective Date Committee

Section 15.3 of the Plan provides that, until the Final Distribution Date, the Committee shall continue in existence; provided, however, that as of the Effective Date, the Committee shall be reconstituted and shall be comprised of at least three (3) and up to five (5) members of the Committee prior to the Effective Date. The Committee members who are no longer members of the Committee as of the Effective Date shall, as of the Effective Date, be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Committee members in the Bankruptcy Cases. In the event of death or resignation of any member of the Committee after the Effective Date, the remaining members of the Committee shall have the right to designate a successor from among the holders of Unsecured Claims. If a Committee member assigns its Claim or releases the Debtors from payment of the balance of its Claim, such act shall constitute a resignation from the Committee. Until a vacancy on the Committee is filled, the Post-Effective Date Committee shall function in its reduced number. Notwithstanding anything in the Plan to the contrary, if at any time the Post-Effective Date Committee does not have at least three (3) members, the Liquidating Agent during such time shall be authorized to enforce and discharge its responsibilities and powers under the Plan without the consent or approval of the Post-Effective Date Committee. The current counsel for the Committee, Cooley Godward Kronish LLP and Benesch Friedlander Coplan & Aronoff LLP, shall continue as counsel for the Post-Effective Date Committee; provided, however, subject to Bankruptcy Court approval, the Post-Effective Date Committee shall be entitled to select other or alternative counsel in its sole discretion.

#### 3. Procedures for Resolving Disputed Claims

Section 6.1 of the Plan provides that, except unless otherwise ordered by the Bankruptcy Court after notice and a hearing, and except as otherwise expressly provided for in the Plan, following the Effective Date, the Debtors through the Liquidating Agent shall be authorized, and vested with the exclusive right, to object to any and all Claims, and initiate, file and/or prosecute such objections on behalf of the Debtors and their Estates so as to have the Bankruptcy Court determine the Allowed amount, if any, of such Claims to be paid under the Plan. All objections to Claims must be filed with the Bankruptcy Court and served upon the holder of the Claim, and all parties who have requested notice in the Bankruptcy Cases, by no later than one hundred twenty (120) days after the Effective Date, or, to the extent applicable, the date set forth in Section 10.1.2, or such other date set by order of the Bankruptcy Court upon the motion of the Liquidating Agent, on behalf of the post-confirmation Debtors, with the consent of the Post-Effective Date Committee, without notice and a hearing. Responses and litigation over

the allowance of any Claim that is the subject of an objection shall be governed by the Bankruptcy Code and the Bankruptcy Rules, and any other applicable order of the Bankruptcy Court. From and after the Effective Date, all objections shall be litigated to Final Order except to the extent that the Liquidating Agent elects, with the consent of the Post-Effective Date Committee, to withdraw such objection or elects to compromise, settle or otherwise resolve any such objection, in which event (A) as to Unsecured Claims, if (i) the amount of such Claim, as set forth in the Schedules and any applicable proof of claim, is $50,000 or less, the Liquidating Agent may settle the objection to such claim without notice to any other party or order of the Bankruptcy Court, (ii) the amount of such Claim as set forth in the Schedules or any applicable proof of claim is greater than $50,000 and less than $250,000, the Liquidating Agent may settle the objection to such Claim for an amount within $25,000 of the amount of such Claim set forth in the Schedules without notice to any other party or order of the Bankruptcy Court, or (iii) the amount of such Claim as set forth in the Schedules or any applicable proof of claim is $250,000 or more the Liquidating Agent may settle the objection to such Claim for an amount within $50,000 of the amount of such Claim set forth in the Schedules without notice to any other party or order of the Bankruptcy Court, or (iv) the settlement amount is any amount other than an amount described in clauses (i) through (iii) of this Section 6.1, the Liquidating Agent may settle the objection to such Claim upon the entry of an order of the Bankruptcy Court approving such settlement after notice and an opportunity to be heard (as that term is used in section 102(1) of the Bankruptcy Code), and (B) as to Administrative Expense Claims, Priority Claims, Priority Tax Claims, and Secured Claims, if (i) the settlement amount is $50,000 or less, the Liquidating Agent may settle the objection to such claim without notice to any party or order of the Bankruptcy Court, or (ii) the settlement amount is greater than $50,000, the Liquidating Agent may settle the objection to such claim upon the entry of an order of the Bankruptcy Court approving such settlement after notice and an opportunity to be heard (as that term is used in section 102(1) of the Bankruptcy Code). Any proposed withdrawal, compromise, settlement or other resolution by the Liquidating Agent of any objection to a Claim or an Administrative Expense Claim shall be made only with the approval of the Post-Effective Date Committee of any such proposed withdrawal, compromise, settlement or other resolution.

### 4. Revesting of Property and Retention of Actions and Defenses

Section 15.2 of the Plan provides that as of the Effective Date, all property of the Estates or the Debtors shall be the property of, and vest in, the Debtors and shall be under the exclusive dominion and control of the Debtors, acting through the Liquidating Agent, for the benefit of the creditors of the Estates. All Estate Actions which constitute property of the Estate within the meaning of section 541 of the Bankruptcy Code, shall be and hereby are preserved for the benefit of the holders of Allowed Claims and the other beneficiaries of the Estate Assets, and shall be and hereby are retained by and vested in the Debtors for all purposes as of the Effective Date. On and after the Effective Date, subject to Section 12.6 of the Plan, the Debtors, through the Liquidating Agent, in consultation with the Post-Effective Date Committee, will retain and have the exclusive right, to investigate, pursue, initiate, commence, file, prosecute and/or enforce any and all Estate Actions against any Person that arose before or after the Petition Date. Any proposed initiation, commencement, filing, prosecution, and/or enforcement of any and all Estate Actions against any Person shall be made only in consultation with the Post-Effective Date Committee of any such proposed initiation, commencement, filing, prosecution, and/or enforcement. Except as otherwise provided for herein, as of the Effective Date the Avoidance

Actions, shall be the property of, and vest in, the post-confirmation Debtors and shall be under the exclusive dominion and control of the Post-Confirmation Committee for the benefit of the creditors of the Estates, pursuant to the terms of the Settlement Agreement. Pursuant to the terms of the Settlement Agreement, the Post-Effective Date Committee has the exclusive right, to investigate, pursue, initiate, commence, file, prosecute, and/or enforce any and all Avoidance Actions against any Person that arose before or after the Petition Date.

### 5. Settlement and Compromise of Estate Actions and Avoidance Actions

Section 15.2.1 of the Plan provides that the Debtors, through the Liquidating Agent, in consultation with the Post-Effective Date Committee, shall have the right and authority, without notice to any party or further order of the Bankruptcy Court, to settle or compromise all Estate Actions enforced by the Debtors, through the Liquidating Agent or the Post-Effective Date Committee after the Effective Date where (i) the original amount sought in such action is $10,000 or less, (ii) the original amount sought in such action is greater than $10,000 and less than $100,000 and the settlement amount is seventy percent (70%) or more of the original amount sought in such action, and (iii) the original amount sought in such action is $100,000 or more and the settlement amount is eighty percent (80%) or more of the original amount sought in such action. The Debtors, through the Liquidating Agent, shall have the right and authority, with the consent of the Post-Effective Date Committee without notice to any party or further order of the Bankruptcy Court, to settle or compromise any other Estate Actions. Any proposed settlement or compromise of any Estate Action by the Liquidating Agent shall be made only with the prior approval of the Post-Effective Date Committee of any such proposed settlement or compromise. Consistent with Section 15.14 of the Plan, the Debtors and the Liquidating Agent shall also have the authority to execute any documents or take any other action required to effectuate such settlements or compromises. The Post-Effective Date Committee, shall have the right and authority, without notice to any party or further order of the Bankruptcy Court, to settle or compromise all Avoidance Actions after the Effective Date where (i) the original amount sought in such action is $10,000 or less, (ii) the original amount sought in such action is greater than $10,000 and less than $100,000 and the settlement amount is seventy percent (70%) or more of the original amount sought in such action, and (iii) the original amount sought in such action is $100,000 or more and the settlement amount is eighty percent (80%) or more of the original amount sought in such action. Consistent with Section 15.14 of the Plan, the Debtors, the Liquidating Agent, and Post-Effective Date Committee shall also have the authority to execute any documents or take any other action required to effectuate such settlements or compromises.

### 6. Executory Contracts

Section 10.1 of the Plan provides that effective on and as of the Effective Date, all Executory Contracts that exist between a Debtor and any Person and that have not previously been assumed and assigned or rejected by the Debtors will be deemed rejected pursuant to section 365 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute approval, pursuant to section 365(a) of the Bankruptcy Code, of the rejection of executory contracts rejected pursuant to the Plan.

### G. Effects of Plan Confirmation

#### 1. Satisfaction of Claims

Section 12.1 of the Plan provides that the treatment of and consideration to be received by holders of Allowed Claims pursuant to the Plan will be in full satisfaction of such holders' respective Claims against the Estates.

#### 2. Injunction

The Plan is designed and intended to be the sole means for resolving, paying or otherwise dealing with Claims and Equity Interests. To that end, Section 12.2 of the Plan provides that and after the Effective Date all Persons that have held, currently hold or may hold a Claim or other debt or liability against any of the Debtors or their Estates, or who have held, currently hold or may hold an Equity Interest in the Debtors, are permanently enjoined from taking any of the following actions (whether directly, indirectly, derivatively or otherwise) on account of such Claim or Equity Interest: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against or affecting the Debtors, the Estates, the Liquidating Agent, the Committee or the Post-Effective Date Committee with respect to any property to be distributed under the Plan including funds or reserves held or maintained by any of them pursuant to the Plan; (ii) enforcing, levying, attaching, collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against any of the Debtors, the Estates or the Liquidating Agent with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to the Plan; (iii) creating, perfecting or enforcing in any manner directly or indirectly, any lien, charge or encumbrance of any kind against the Debtors, the Estates or the Liquidating Agent with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to the Plan; and (iv) proceeding in any manner in any place whatsoever against any of the Debtors, the Estates, or the Liquidating Agent with respect to any property to be distributed under the Plan, including funds or reserves held or maintained by any of them pursuant to the Plan in any way that does not conform to, or comply, or is inconsistent with, the provisions of the Plan; provided, however, that nothing in this Section 12.2 shall prohibit any Person from enforcing the terms of the Asset Purchase Agreements, the Plan, or the Confirmation Order in the Bankruptcy Court.

#### 3. No Liability for Solicitation or Participation

Section 12.3 of the Plan provides that, pursuant to section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

### 4. Limitation of Liability of Exculpated Persons

Section 12.4 of the Plan provides that the Exculpated Persons will not have or incur any liability to any Person for any act taken or omission made in connection with or in any way related to negotiating, formulating, implementing, confirming, consummating or administering the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with or related to the Plan or the Bankruptcy Cases, or any other act taken or omission made in connection with the Bankruptcy Cases; provided that the provisions of section 12.4 will have no effect on the liability of any Person that results from any act or omission that is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct; and provided further that nothing in section 12.4 of the Plan shall prohibit any Person from enforcing the terms of the Asset Purchase Agreement in the Bankruptcy Court against the Debtors or the Liquidating Agent. In addition, no Person serving as Liquidating Agent will have or incur any personal liability as the shareholder, director or officer of any of the Debtors for any act taken or omission made in connection with Article VIII of the Plan, except for any personal liability of such Person that would not have resulted but for an act or omission of such Person that is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct.

### 5. Indemnification by Debtors

Section 12.5 of the Plan provides that the Debtors will indemnify, hold harmless and reimburse the Exculpated Persons, the Liquidating Agent (including any Person serving as the Liquidating Agent), the Post-Effective Date Committee and its members (solely in their capacity as committee members), and any of the accountants, advisors, agents, attorneys, consultants, directors, members, employees, officers, representatives, or professional persons of such Persons from and against any and all losses, claims, causes of action, damages, fees, expenses, liabilities, and actions arising from or related to any act taken or omission made in connection with or in any way related to negotiating, formulating, implementing, confirming, consummating or administering the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with or related to the Plan or the Bankruptcy Cases, or any other act taken or omission made in connection with the Bankruptcy Cases, and the losses, claims and expenses of such Persons will be paid from the Estate Assets as they are incurred by such Persons. The Debtors will not indemnify, hold harmless or reimburse any Person pursuant to such provisions from or against any losses, claims, causes of action, damages, fees, expenses, liabilities or actions resulting from any act or omission that is determined in a Final Order to have constituted fraud, gross negligence or willful misconduct. All rights of the Exculpated Persons and other Persons indemnified pursuant to sections 12.4 and 12.5 of the Plan will survive confirmation and effectiveness of the Plan.

### 6. Releases of Debtor Releasees

Section 12.6 of the Plan provides that in consideration of the efforts expended and to be expended by the Debtors' officers and directors in conjunction with the Bankruptcy Cases and the Plan, subject only to the exclusive rights of the Liquidating Agent set forth in Section 12.6 of the Plan, as of the Effective Date, the Debtors automatically will release and shall be deemed to release the Debtro Releasees from any and all claims, obligations, rights, suits,

damages, causes of action, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that the Debtors or their estates would have been legally entitled to assert in their own right or on behalf of the holder of any Claim or Equity Interest or other Person, based in whole or in part upon any actions, conduct or omissions occurring prior to the Effective Date and including any actions, conduct or omissions occurring in connection with the Bankruptcy Cases. Notwithstanding the foregoing, the Liquidating Agent, with the consent of the Post-Effective Date Committee, will retain and have the exclusive right to investigate, pursue, initiate, commence, file prosecute and/or enforce any and all such Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities against the Debtro Releasees; provided, however, that all such Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities that are not subject to an adversary proceeding commenced by the Committee on or before the Effective Date, will be deemed irrevocably and forever released as of the Effective Date to the extent set forth above. The Confirmation Order shall constitute an order approving the compromise, settlement and release of any and all such claims pursuant to section 1123(b)(3)(A) of the Bankruptcy Code. The Debtors do not believe they hold any such claims against the Debtor Releasees. Section 12.6 does not release the Debtor Releasees from any third-party claims, except to the extent that the Debtors are entitled to asert such claims on behalf of such third parties. The officers and directors of the Debtors released by section 12.6 are:

David Peek

Regis Hebbeler

### 7. Term of Injunctions and Stays

Section 12.7 of the Plan provides that, unless otherwise provided in the Plan or in another order of the Bankruptcy Court, all injunctions or stays provided for in the Bankruptcy Case pursuant to sections 105, 362 and 524 of the Bankruptcy Code, or otherwise, and in effect on the Confirmation Date will remain in full force and effect until the Effective Date.

### 8. Release of Liens

Section 12.8 of the Plan provides that, except as otherwise provided in the Plan or the Confirmation Order, all Liens, security interests, deeds of trust, pledges, guaranties, indemnities or mortgages against property of the Debtor or the Estate will be released, cancelled, terminated, and nullified on the Effective Date.

### 9. Cancellation of Instruments

Section 12.9 provides that, unless otherwise provided for in the Plan, on the Effective Date, all notes, certificates, shares, instruments or other evidences of any Equity Interest will be cancelled and deemed null and void as of the Effective Date.

### H. Bankruptcy Court to Retain Jurisdiction

Section 14.1 of the Plan provides that, following the Effective Date, and notwithstanding the entry of the Confirmation Order, the Bankruptcy Court will retain exclusive

jurisdiction of the Bankruptcy Cases and all matters arising under, arising out of, or related to, the Bankruptcy Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

a) Hear and determine motions, applications, adversary proceedings, and contested matters pending or commenced after the Effective Date;

b) Hear and determine objections (whether filed before or after the Effective Date) to, or requests for estimation of any Claim, and to enter any order requiring the filing of proof of any Claim before a particular date;

c) Ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

d) Enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

e) Construe and take any action to enforce the Plan and the Confirmation Order;

f) Issue such orders as may be necessary for the implementation, execution and consummation of the Plan and to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and the Confirmation Order;

g) Hear and determine any applications to modify the Plan, to cure any defect or omission or to reconcile any inconsistency in the Plan, the Disclosure Statement or in any order of the Bankruptcy Court including, without limitation, the Confirmation Order;

h) Hear and determine all applications for Professional Claims required by the Plan;

i) Hear and determine other issues presented or arising under the Plan, including disputes among holders of Claims and arising under agreements, documents or instruments executed in connection with the Plan;

j) Determine such other matters and for such other purposes as may be provided in the Confirmation Order;

k) Hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

l) Enter the Final Decree; and

m) Hear and determine any action concerning the recovery and liquidation of Estate Assets, wherever located, including without limitation, litigation to

liquidate and recover Estate Assets that consist of, among other things, the Avoidance Actions and the Estate Actions, or other actions seeking relief of any sort with respect to issues relating to or affecting Estate Assets; and to hear and determine any action concerning the determination of taxes, tax refunds, tax attributes, and tax benefits and similar or related matters with respect to the Debtor or the Estate including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code.

**CLAIMHOLDERS ARE URGED TO READ THE PLAN IN FULL SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

## IV.    CONFIRMATION AND CONSUMMATION PROCEDURE

### A.    Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing with respect to the Plan. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code described below are met.

The Confirmation Hearing is scheduled to commence on March 3, 2010, at 9:00 a.m. (Prevailing Eastern Time) before the Honorable Christopher S. Sontchi, United States Bankruptcy Court, District of Delaware, 824 Market Street., 5th Floor, Courtroom #6, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

### B.    Requirements of section 1129(a) of Bankruptcy Code

The Bankruptcy Court will confirm the Plan only if it finds that all of the applicable requirements enumerated in section 1129(a) of the Bankruptcy Code have been met or, if all of the requirements of section 1129(a) other than the requirements of section 1129(a)(8) have been met (i.e., that all impaired classes have accepted the plan), that all of the applicable requirements enumerated in section 1129(b) of the Bankruptcy Code have been met.

Among other things, sections 1129(a) and (b) require that the Plan be (i) accepted by all impaired Classes of Claims and Equity Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible, and (iii) in the "best interests" of Claimholders and equity interest holders that are impaired under the Plan.

Section 4.4 of the Plan provides that Class 4 is not receiving any distribution under the Plan and is deemed not to have accepted the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, as to such Class and any other Class that votes to reject the Plan, the Debtors are seeking confirmation of the Plan in accordance with sections 1129(a) and (b) of the Bankruptcy Code either under the terms provided herein or upon such terms as may exist if the Plan is modified in accordance with section 1127(d) of the Bankruptcy Code.

THE DEBTORS BELIEVE THAT THE PLAN SATISFIES OR WILL SATISFY, AS OF THE CONFIRMATION DATE, ALL OF THE REQUIREMENTS FOR CONFIRMATION.

### 1. Best Interests Test

In order to confirm the Plan, the Bankruptcy Court must, pursuant to section 1129(a)(7) of the Bankruptcy Code, independently determine that the Plan is in the best interests of each holder of a Claim or Equity Interest in any impaired Class who has not voted to accept the Plan. This is often called the "best interests of Claimholders" test. Accordingly, if an impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impaired Class a recovery on account of the Class member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

The Bankruptcy Cases have proceeded as liquidating chapter 11 cases since the Petition Date. As of the date of this Disclosure Statement, the Debtors believe that more funds are likely to exist after the prosecution, collection or settlement of certain causes of action if the case continues in chapter 11 rather than if the case is converted to chapter 7 for completion. Insufficient funds exist and no prospect of sufficient additional funds exist to allow for any payment to holders of Equity Interest regardless of whether the cases are completed under chapter 11 or chapter 7 of the Bankruptcy Code.

The only issue under the best interest of Claimholders test is the value of distributions available for Claimants if the Plan is confirmed compared to the value of distributions available to Claimants if the cases are converted to chapter 7. As more fully set forth in the liquidation analysis attached hereto as <u>Exhibit B</u>, the Debtors believe that larger distributions will be available to Claimants under the Plan than under chapter 7 and, therefore, that the Plan meets the best interest of Claimholders test. Conversion of the Bankruptcy Cases to chapter 7 of the Bankruptcy Code would replace the Liquidating Agent with a chapter 7 trustee. As a consequence, the liquidation and completion of this case would be substantially disrupted. Disruption would occur because a chapter 7 trustee would be unfamiliar with the case, as would the chapter 7 trustee's counsel. A chapter 7 trustee may be required to employ new counsel that might be unfamiliar with the issues requiring resolution in the estate. The Claimants would bear the cost of educating the chapter 7 trustee, resulting in delays and reduced distributions. Furthermore, all fees of, and expenses incurred by, the chapter 7 trustee and its professionals would have priority over all Administrative Expense Claims and Unsecured Claims previously incurred in these Chapter 11 Cases under section 726(b) of the Bankruptcy Code.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan. Under the terms of the Plan, the Allowed Claims potentially being paid in Cash are the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Secured Claims, Allowed Priority Claims, Allowed WARN Act (Union) Priority Claims, and Allowed WARN

Act (Class) Priority Claims. The Debtors presently estimate that the total amount of such payments will be less than $8,375,000 and have sufficient funds to cover these payments as and when they become due, with the balance of funds being paid to Allowed Unsecured Claims, Allowed WARN Act (Union) Settlement Claims, and Allowed WARN Act (Class) Settlement Claims, on a pro rata basis and in accordance with the WARN Act Settlements.

The Plan clearly complies with the feasibility requirement because (i) the Debtor has sufficient cash or will have sufficient cash to satisfy its plan payment obligations and (ii) all of the Debtors' remaining assets are being distributed to Claimholders and therefore the company will be dissolved pursuant to the Plan. Accordingly, the Estates will no longer exist to be subject to future reorganization or liquidation.

### 3.     Acceptance by Impaired Classes

By this Disclosure Statement, the Debtors are seeking the affirmative vote of each impaired Class of Claims under the Plan that is proposed to receive a distribution under the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, a class that is not "impaired" under a plan will be conclusively presumed to have accepted such plan; solicitation of acceptances with respect to any such class is not required. Pursuant to section 1126(g) of the Bankruptcy Code, a class of claims or interests that does not receive or retain any property under a plan of liquidation is deemed not to have accepted the plan, although members of that class are permitted to consent, or waive objections, to its confirmation.

Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless a plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or interest entitles the holder thereof, or (b) (i) cures any default (other than defaults resulting from the breach of an insolvency or financial condition provision), (ii) reinstates the maturity of such claim or interest, (iii) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on any contractual provision or applicable law entitling such holder to demand or receive accelerated payments after the occurrence of a default, and (iv) does not otherwise alter the legal, equitable or contractual rights to which the holder of such claim or interest is entitled.

Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims has accepted a plan of liquidation when such plan has been accepted by Claimholders (other than an entity designated under section 1126(e) of the Bankruptcy Code) that hold at least two thirds in dollar amount and more than one half in number of the allowed claims of such class held by Claimholders (other than any entity designated under section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the plan. A class of interests has accepted a plan if the plan has been accepted by holders of interests (other than any entity designated under section 1126(e) of the Bankruptcy Code) that hold at least two thirds in amount of the allowed interests of such class held by interest holders (other than any entity designated under section 1126(e) of the Bankruptcy Code) that have actually voted to accept or reject the plan. Section 1126(e) of the Bankruptcy Code allows the Bankruptcy Court to designate the votes of any party that did not vote in good faith or whose vote was not solicited or procured in good faith or in accordance with the Bankruptcy Code. Holders of claims or interests who fail to vote are not counted as either accepting or rejecting the plan.

### 4. Confirmation Without Acceptance by All Impaired Classes

Because Class 4 (Equity Interests) is deemed not to have accepted the Plan, the Debtors are seeking confirmation of the Plan as to such Class, and as to any other Class that votes to reject the Plan, pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code provides that the Bankruptcy Court may still confirm a plan at the request of a debtor if, as to each impaired Class that has not accepted the plan, the plan "does not discriminate unfairly" and is "fair and equitable."

Section 1129(b)(2)(A) of the Bankruptcy Code provides that with respect to a non accepting class of impaired secured claims, "fair and equitable" includes the requirement that the plan provides (a) that each holder of a claim in such class (i) retains the liens securing its claim to the extent of the allowed amount of such claim and (ii) receives deferred cash payments at least equal to the allowed amount of its claim with a present value as of the effective date of such plan at least equal to the value of such creditor's interest in the debtor's interest in the property securing the creditor's claim, (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of the property securing the creditor's claim, free and clear of the creditor's liens, with those liens attaching to the proceeds of the sale, and such liens on the proceeds will be treated in accordance with clauses (a) or (c) thereof, or (c) for the realization by the creditor of the "indubitable equivalent" of its claim.

Section 1129(b)(2)(B) of the Bankruptcy Code provides that with respect to a non accepting class of impaired unsecured claims, "fair and equitable" includes the requirement that (a) the plan provide that each holder of a claim in such class receives or retains property of a value as of the effective date equal to the allowed amount of its claim, or (b) the holders of claims or interests in classes that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such junior claim or interest.

Section 1129(b)(2)(C) of the Bankruptcy Code provides that with respect to a non accepting class of impaired equity interests, "fair and equitable" includes the requirement that (a) the plan provides that each holder of an impaired interest in such class receives or retains property of a value as of the effective date equal to the greatest of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, and (iii) the value of such interest, or (b) the holders of all interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe that the Plan does not discriminate unfairly against, and is fair and equitable as to, each impaired Class under the Plan.

## V. RISK FACTORS

### A. Allowed Claims May Exceed Estimates

The projected distributions set forth in this Disclosure Statement are based upon the Debtors' good faith estimate of the amount of the expenses that will be incurred and the total amount of Claims that will ultimately be Allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative

and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any Class could be greater than anticipated, which will impact the distributions to be made to holders of Claims and could prevent the Debtors from being able to satisfy the conditions precedent to the Effective Date, as set forth in Section 11.1 of the Plan.

### B.    Plan May Not Be Accepted or Confirmed

While the Debtors believe the Plan is confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree.

## VI.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

**IRS CIRCULAR 230 NOTICE: TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL INCOME TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.    Introduction

Implementation of the Plan may have federal, state, local or foreign tax consequences to the Debtors as well as to Claimants and Equity Interest holders in the Debtors. No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan. The following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion does not address every aspect of the U.S. federal income tax laws that may be relevant to Claimants or Equity Interest holders in light of their individual circumstances, or to certain types of Claimants or Equity Interest holders subject to special treatment under U.S. federal income tax laws, such as foreign persons, banks, insurance companies, financial institutions, regulated investment companies, broker-dealers, investors in pass-through entities, tax-exempt organizations, and Claimants who hold their Claims as part of a hedging transaction, straddle, conversion transaction, or other integrated transaction. The following discussion does not attempt to consider any facts or limitations applicable to any particular Claimants or Equity Interest holder that may modify or alter the consequences described below. This disclosure also does not address state, local, or foreign tax consequences, or the consequences of any federal tax other than the federal income tax.

The following discussion is based upon the provisions of the Internal Revenue Code of 1986, as amended, the Treasury Regulations promulgated thereunder, and published rulings and court decisions in effect as of the date hereof, all of which are subject to change,

possibly retroactively. Any such changes could modify or adversely affect the tax consequences summarized below.

Each Claimant or Equity Interest holder in the Debtors is urged to consult with its own tax advisor in determining the federal, state, local, and foreign income and other tax consequences of the transactions contemplated by the Plan.

## B.    Federal Income Tax Consequences to the Debtors

### 1.    Sale of Assets

For federal income tax purposes, the Debtors have either elected to be taxed as corporations or are otherwise disregarded for federal income tax purposes. The Debtors have sold substantially all of their operating assets and continue to liquidate their remaining assets. If the sales of the Debtors' assets generate a net gain for federal income tax purposes, the Debtors will incur tax on such gain to the extent that gain realized exceeds the Debtors' available net operating losses and net operating loss carryovers, or to the extent of any alternative minimum tax liability that may not be fully offset by available net operating loss carryforwards. Such gain would be taxable to the Debtors at rates ranging from 15% to 35%.

### 2.    Cancellation of Indebtedness Income

In general, the discharge of a debt obligation by the obligor for an amount less than the adjusted issue price of such obligation gives rise to cancellation of indebtedness income that must be included in the obligor's gross income for federal income tax purposes, unless the payment of the discharged obligation would have given rise to a deduction. However, cancellation of indebtedness income is not included in gross income if the obligor is under the jurisdiction of the court in a Title 11 case and the discharge is granted by the court or is pursuant to a plan approved by the court. Instead, the amount excluded from gross income is applied to reduce the obligor's tax attributes, if any, in the following order: (a) net operating losses and net operating loss carryovers; (b) general business credits; (c) minimum tax credits; (d) capital loss carryovers; (e) basis of property of the taxpayer; (f) passive activity loss or credit carryovers; and (g) foreign tax credit carryovers. Tax attributes generally are reduced by one dollar for each dollar of discharged indebtedness excluded from gross income, except that tax credits are reduced by one-third of the amount excluded from gross income. Any reduction of the Debtors' net operating losses or net operating loss carryover would reduce the amount of net operating losses and net operating loss carryovers available to offset gain, if any, from the sale of the Debtors' assets.

### 3.    Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income at a rate of twenty percent (20%) to the extent such tax exceeds the corporation's regular federal income tax liability. In computing alternative minimum taxable income, certain tax deductions and other adjustments are modified or eliminated. In particular, even though a corporation may otherwise be able to offset all of the corporation's taxable income for regular tax purposes with available net operating losses or net operating loss carryovers, only ninety percent (90%) of a corporation's alternative minimum

taxable income may be offset with available net operating losses (as recomputed for AMT purposes). Accordingly, to the extent that the Debtors have taxable income, the Debtors may be subject to AMT even though such income would be offset by available net operating losses for regular federal income tax purposes.

## C. Federal Income Tax Consequences To Claimholders

### 1. Recognition of Gain or Loss

A Claimant will recognize gain or loss on the exchange of such Claimant's Claim for cash and any other consideration received pursuant to the Plan in an amount equal to the difference between (i) the amount realized in respect of such Claim (other than amounts attributable to accrued interest) and (ii) the Claimant's tax basis in such Claim. In general, the amount realized in respect of a Claim will equal the sum of any cash and the aggregate fair market value of any other consideration received for such Claim pursuant to the Plan.

The character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes), the tax status of the Claimant, whether the Claim constitutes a capital asset in the hands of the Claimant and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the Claimant previously claimed a bad debt deduction with respect to the underlying Claim.

Because consideration for Claims may be distributed at various times after the Effective Date, Claimants may be required to treat a portion of the consideration received after the Effective Date as imputed interest. Claimants should consult their tax advisors regarding the effect of distributions of consideration after the Effective Date on the timing, character, and amount of income, gain, or loss recognized by such Claimants.

### 2. Accrued Interest

A Claimant will recognize ordinary income to the extent that any consideration received pursuant to the Plan is allocable to accrued but unpaid interest not previously included in such Claimant's taxable income. If the amount of accrued but unpaid interest previously included in such Claimant's taxable income exceeds the amount of consideration allocable to such interest, the Claimant should be treated as recognizing an ordinary loss.

Pursuant to the Plan, consideration received in respect of a Claim will be allocated first to the principal amount of such Claim, with any excess allocated to unpaid accrued interest. However, there is no assurance that the Internal Revenue Service will respect this allocation for federal income tax purposes. Claimants are urged to consult their tax advisors regarding the allocation and income tax treatment of consideration received for accrued but unpaid interest for tax purposes.

### 3. Backup Withholding

All distributions to Claimants under the Plan are subject to all applicable withholding tax requirements. Under federal income tax law, payments to the Claimants may, under certain circumstances, be subject to "backup withholding" at the current rate of 28%. Backup withholding generally applies if the Claimant (a) fails to furnish a taxpayer identification number ("TIN") and to state that the holder is a U.S. citizen or other U.S. person, (b) furnishes an incorrect TIN, (c) fails to properly report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is the Claimant's correct number and that the Claimant is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment of the Claimant's tax liability. Backup withholding amount may be refunded to the extent all amounts paid by or on behalf of a Claimant for a taxable year result in an overpayment of tax and the Claimant files a timely return seeking a refund of the overpayment. Certain persons are exempt from backup withholding requirements, including, in certain circumstances, corporations and financial institutions.

### D. Federal Income Tax Consequences to Holders of Equity Interests

Under the Plan, all Equity Interests in the Debtors will be cancelled. The holders of Equity Interests will not be entitled to any distribution under the Plan. Each holder of an Equity Interest in the Debtors may be entitled to recognize a loss on such Equity Interests at the time such Equity Interests become worthless for tax purposes. The amount of the loss would be an amount equal to holder's tax basis, if any, in the Equity Interests. If the Equity Interests were held as a capital asset, the loss would be (i) a long-term capital loss if the Equity Interest holder's holding period is one year or longer or (ii) a short-term capital loss if the Equity Interest holder's holding period is shorter than one year.

### E. General Disclaimer

**The foregoing discussion is not intended to be a substitute for careful tax planning, particularly since certain of the federal income tax consequences of the Plan will not be the same for all Claimants or Equity Interest holders due to their individual circumstances. Each Claimant and Equity Interest holder of the Debtors is strongly urged to consult with its own tax advisor in determining the federal, state, local, and foreign income and other tax consequences of the transactions contemplated by the Plan.**

# VII.   CONCLUSION AND RECOMMENDATION

The Debtors believe that the confirmation and consummation of the Plan is preferable to all other alternatives.

THE DEBTORS URGE ALL CLAIMHOLDERS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS TO THE DEBTORS SO THAT THEY WILL BE RECEIVED BY _:00 _.M. (ET) ON _____ ___, 2010.

Dated: Wilmington, Delaware
      December 23, 2009

By: <u>/s/ David G. Peek</u>
Name: David G. Peek
Title:  Executive Vice President, Chief Financial Officer, and Secretary of Goody's, LLC

*Debtors and Debtors in Possession*